RUMORA *v.* BD. OF EDN. OF ASHTABULA AREA CITY SCHOOL DISTRICT ET AL.

50

(Civil Action No. 60619 73-Civ. 203—Decided
November 1, 1973.)

Common Pleas Court of Ashtabula County.

*Messrs. Berkman, Gordan & Kancelbaum, Mr. Bernard
A. Berkman, Mr. Joshua J. Kancelbaum* and *Mr. Charles M.
Diamond,* for plaintiff.
*Messrs. Sheldon, Warren & Kauffman, Mr. Carey S.
Sheldon, Mr. James S. Warren, Mr. David C. Sheldon* and
*Mr. Gary L. Coxon,* for defendants.

WHITESIDE, J. (sitting by designation). By this action,
plaintiff seeks reinstatement to his position as superintend-
ent of the Ashtabula Area City Schools from which he was
discharged by the defendant, Board of Education of Ashta-
bula Area City School District.

Plaintiff was employed by the board of education as
superintendent for a term of three years commencing Au-
gust 1, 1971. On August 15, 1972, the board of education,
by resolution, determined to consider the termination of
plaintiff's contract and suspended plaintiff pending such
determination. The matter was referred to a referee for
hearing. The hearing began November 17, 1972, and con-
cluded March 19, 1973, consuming 23 hearing days, during
which testimony was received from 22 witnesses and 112
exhibits were offered. The referee rendered his report
on or about June 12, 1973, recommending that plaintiff's
contract not be terminated. On June 14, 1973, the board
of education rejected the findings and recommendations of
the referee and ordered termination of plaintiff's contract
of employment. On June 15, 1973, plaintiff filed his peti-
tion herein pursuant to R. C. 3319.16.

In light of *State, ex rel. Saltsman,* v. *Burton* (1952),
156 Ohio St. 537, the court at the initial hearing herein
raised the question of applicability of R. C. 3319.16 to the
contract of a superintendent since that section specifically
refers to "the contract of a teacher." After reviewing the

applicable law, the court concludes that R. C. 3319.16 is applicable to termination of the contract of a superintendent.

R. C. 3319.09(A) defines "teacher" as including "instructors, principals, superintendents," and other certificated personnel employed in an educational position. However, as pointed out in *Saltsman, supra*, the statutes recognize a distinction between a classroom teacher and superintendents and other supervisory and administrative personnel.

Prior to August 1969, there was no express provision in the statutes relating to procedure for termination of the contract of a superintendent. Prior to that time, R. C. 3319.01 referred to vacancies resulting from "removal for cause" (and still does), and R. C. 3319.12 provided that "a teacher employed as superintendent may be transferred to another position by a majority vote of the board." Effective August 18, 1969, R. C. 3319.12 was amended to read in pertinent part as follows:

"Except by mutual agreement of the parties thereto a teacher employed under a contract of employment in an administrative, or supervisory position in a school district, or in any position provided for by section 3319.01 or 3319.02 of the Revised Code, shall not be transferred during the life of his contract to a position of lesser responsibility. No contract or supplemental contract for the employment of a teacher, whether for an administrative or supervisory position, a position provided for by sections 3319.01 and 3319.02 of the Revised Code, regular teaching duties, or additional duties, may be terminated or suspended by a board of education except pursuant to section 3319.02 or 3319.16 of the Revised Code * * *."

Since the only position provided for by R. C. 3319.01 is that of superintendent, and R. C. 3319.02 contains no provision for termination of a contract of a superintendent, R. C. 3319.16 is applicable to the termination or suspension of the contract of a superintendent.

At the outset, plaintiff contends that the notice of charges given to him by the board of education was so vague as to violate R. C. 3319.16 and to deprive him of

due process of law. There is no merit to this contention. R. C. 3319.16 requires that the board of education furnish a teacher with a written notice of intention to consider the termination of his contract "with full specification of the grounds for such consideration." The board of education determined to consider termination of plaintiff's contract on the grounds of "gross inefficiency, willful and persistent violations of reasonable regulations of the board of education, and for other good and just cause." The notice to plaintiff, in addition to stating these grounds and some general statements concerning responsibility of a board and a superintendent, contains fifteen specific allegations of misconduct on the part of plaintiff. These specifications were sufficient to advise plaintiff of the charges against him and to satisfy the requirement both of R. C. 3319.16 and of due process of law.

Plaintiff next contends that "the defendant board of education constituted a biased tribunal whose adjudication of these proceedings denied plaintiff a fair hearing required by due proces." A review of the record herein reveals no bias on the part of the board of education, or any of its members, which is not inherent in the statutory scheme which requires that the board be accuser, prosecutor, and determiner of the facts (and in this case also witnesses) when considering termination of the contract of a superintendent. Obviously, a board of education will not commence proceedings to terminate the contract of a superintendent unless it believes that at least probable cause exists to justify such action. However, R. C. 3319.16 does provide that the hearing may be conducted by an impartial person, a referee, which was done in this case.

There is nothing in this record that would justify a finding of unconstitutional application of R. C. 3319.16 that would not be true in every situation where a board of education is considering termination of a contract of a superintendent. However, the basic procedure is not unlike other situations where an appointing authority is considering discharge of an employee. Cf. R. C. 143.27.

Although there is no administrative appeal provided in this instance from the action of the appointing authority,

the board of education, the statute does provide for a hearing before an impartial referee and final factual determination of the matter by the Court of Common Pleas.

The determination by the Court of Common Pleas must be upon the certified transcript of all evidence adduced at the hearings before the referee and such other evidence as may be adduced before the court. In this case, by agreement, only limited additional documentary evidence was offered. The court then makes such determination, "as may be proper in accordance with the evidence adduced at the hearing."

While the action before this court does not constitute a trial *de novo*, the court must consider and weigh the evidence before it. See *Hale* v. *Board of Education* (1968), 13 Ohio St. 2d 92. Although the determination is predicated primarily upon a certified transcript of all evidence adduced at the hearing before the referee, this proceeding is substantially the equivalent of an appeal on questions of law and fact as defined by R. C. 2505.01.

The court feels that it is undesirable for members of the board of education considering termination of the contract of a superintendent to appear as witnesses at the hearing upon which the final action of the board will be predicated; however, appearance did afford plaintiff the opportunity to cross-examine the board members of which opportunity counsel for plaintiff availed himself at length. Also, the one board member who did not testify initially was called upon cross-examination by plaintiff at the hearing.

Plaintiff relies on *Ward* v. *Monroeville* (1972), 93 S. Ct. 80, in support of his contention that he was denied due process. It is true that in *Ward* it was held that the denial of an impartial tribunal case is not corrected on appeal and trial *de novo* in a court of common pleas. However, *Ward* dealt with criminal cases, not administrative matters concerning the discharge of employees.

The court finds that the statutory scheme of charges being initiated by the board of education, followed by a hearing before a referee, if requested, a determination by the board, and then followed by a full factual determina-

tion on the record, and such additional evidence as may be presented, by the Court of Common Pleas, afford the plaintiff due process of law. The court finds no constitutional infirmity in the proceedings.

Before discussing the specific charges against the plaintiff, the court will discuss what it feels to be the gravamen of this entire controversy. This is the proper relationship and authority between a board of education and its superintendent.

From his testimony and certain other evidence, it appears that Mr. Rumora comprehends the superintendency as an independent executive with the board operating primarily as a legislative body. This very definitely is the approach taken by his counsel both in the brief and oral argument. The minutes of the May 23, 1972 meeting of the board of education indicate the following attributed to Mr. Rumora:

"Mr. Rumora said that the worse thing is to have the Board a rubber stamp of the superintendent. He said there should be a check and balance in the operation of the schools. * * *"

The board of education, or rather the four-member majority of the board, apparently feels that the superintendent is an employee of the board and subject to the direction of the board of education. If this be the approach of the board, it is correct.

The city school district is a political subdivision of the state. The elected board of education is the administrative, quasi-legislative, and quasi-judicial agency charged with the responsibility of management and control of the school system of the school district. The superintendent is not an independent executive head of the political subdivision, the city school district. Rather, he is the executive officer for the board of education. R. C. 3319.01 specifically provides that the superintendent "shall be the executive officer for the board."

R. C. 3313.20 provides that:

"The board of education shall make such rules and regulations as are necessary for its government and the government of its employees, pupils of its schools, and all

other persons entering upon its school grounds or premises. * * *''

R. C. 3313.47 provides that:

''Each city, * * * board of education shall have the management and control of all of the public schools of whatever name or character in its respective district. * * *''

Thus, as stated in the first paragraph of the syllabus in *Greco* v. *Roper* (1945), 145 Ohio St. 243:

''Under the statues of Ohio, a board of education is charged with the management and control of the public schools in its district and is vested with authority to make such rules and regulations as it deems necessary for its government and the government of its employees.''

There are also various other statutes granting specific powers to the board of education including the power to appoint teachers and other personnel.

R. C. 3319.01 provides that a superintendent shall ''direct and assign teachers and other employees of the schools under his supervision'' and ''assign the pupils of the schools under his supervision the proper schools and grades.'' In addition, R. C. 3319.02, 3319.07, and 3319.11 require a superintendent to make recommendations as to the employment of teachers, principals, and certain other supervisory personnel. Also, R. C. 3313.66 confers upon the superintendent the authority to suspend or expel a pupil, and the superintendent is required to make certain reports such as that required by R. C. 3317.061. However, the basic duties of a superintendent are necessarily those he is directed to perform by the board of education pursuant to R. C. 3319.01 which provides that the superintendent shall ''perform such other duties as the board determines.''

There is one area wherein there might be an apparent conflict between the power and authority conferred upon a board of education and the duties imposed upon its superintendent. R. C. 3319.01 provides that the superintendent shall ''direct and assign teachers and other employees of the schools under his supervision''; whereas, R. C. 3313.20 provides that the board of education shall make such rules and regulations as are necessary ''for the government of its employees,'' which necessarily includes the superin-

tendent, teachers and other employees of the schools under the supervision of the superintendent. The court finds, however, that there is no real conflict between these sections. The board of education is the ultimate authority charged with the responsibility for management, control, and government of the school system and may adopt rules and regulations therefor. The superintendent, as executive for the board, is charged with the responsibility of implementing such rules and regulations.

In directing and assigning teachers and other employees, the superintendent must do so within the framework of the reasonable rules and regulations adopted by the board. There is no indication from the language of R. C. 3319.01 that it is intended as a limitation of the broad power of a board of education in the management and control of the school system conferred by R. C. 3313.-20 and 3313.47. Rather, the language appears to be descriptive of the duties of the superintendent. R. C. 3319.01 must be contrasted with R. C. 3319.07 which does contain limitations upon the powers of a board of education with respect to the appointment of teachers and principals.

Attention must now be focused upon the charges against the plaintiff and the merits thereof. The grounds for considering termination of plaintiff's contract were stated by the board of education as being "gross inefficiency, willful and persistent violations of reasonable regulations of the board of education, and for other good and just cause." Willful and persistent violations of reasonable regulations is a form of insubordination. At the risk of oversimplification of the issues, the court will consider the specific allegations of misconduct as falling into two general categories: inefficiency and insubordination.

There were fifteen allegations of misconduct set forth in the notice to plaintiff. There were also fifteen allegations of misconduct set forth in the resolution of the board discharging plaintiff following the hearing. However, the tenth allegation set forth in the notice was not included in the resolution of discharge, and the fifteenth allegation of misconduct set forth in the resolution of discharge was

not contained in the notice. Accordingly, the court will consider as withdrawn the tenth allegation of misconduct set forth in the notice and will not consider the fifteenth allegation of misconduct set forth in the resolution of discharge, since no notice thereof was given plaintiff prior to hearing.

The six allegations of misconduct which the court considers as raising the issuing of insubordination are allegations 1, 2, 3, 5, 6 and 13, which read as follows:

"1. Your refusal to accept and professionally follow the directives contained in the present Organizational Chart adopted by this Board.

"2. Your unwarranted and unauthorized interference with the policy-making function of this Board; and your willful refusal to execute and administer Board policies, directives and agreements made with recognized employee and professional bargaining units.

"3. Your unauthorized interference with this Board's appointed negotiating authority in its negotiations with the certified and non-certified staffs, as well as with the recognized bargaining units of the school system.

"5. Your refusal to comply with a Board directive to appoint a principal at the Plymouth Elementary School.

"6. Your refusal to recognize and comply with a Board directive to recommend a person to fill the vacant position in the system's Audio-Visual Aid department.

"13. An ethical question involving your persistent attention to and influence of one Board member to the exclusion of the other four remaining Board members."

The specific allegations of misconduct must be considered in light of the surrounding circumstances. The plaintiff, Mr. Rumora, was appointed superintendent in 1971 for a three-year term by a three-to-two vote of the board of education. Mr. Rumora had no previous connection with the school district. Another applicant for the position was the assistant superintendent, Mr. Candela, who, subsequent to the appointment of the plaintiff, brought an action to contest the appointment which he testified was for the purpose of testing the board's policy of promo-

tion from within the system which was not followed in that instance. This lawsuit was subsequently settled, and Mr. Candela again became assistant superintendent for a three-year term.

At the ensuing November election, two new board members were elected replacing two of the three board members who had voted for the appointment of Mr. Rumora. At the second board meeting, including the two new board members, the board adopted a new organizational chart for the school system (which chart had been prepared previously but not adopted by the board) with the sole dissenting vote being cast by Mr. Robinson, the remaining board member who had voted for the appointment of Mr. Rumora. The minutes of the board meeting reflect that two objections to the adoption of the organizational chart were made by Mr. Rumora: one, that the chart was adopted without first consulting him, and the other, that he felt an organizational chart was an administrative decision.

This points out the basic source of the controversy herein; namely, plaintiff's concept that the superintendent is the administrative officer of the school district, and that the board of education is the legislative body for the school district. However, a board of education is an administrative (not legislative) body possessing certain rule-making powers. As stated in *Wayman* v. *Board of Education* (1966), 5 Ohio St. 2d 248, at page 249:

"It is well settled that a board of education is a quasi corporation acting for the public as one of the state's ministerial education agencies 'for the organization, administration and control of the public school system of the state.' *Cline* v. *Martin*, 94 Ohio St. 420, 426. * * *"

The distinction between the superintendent and the board of education is well stated at page 54 of Rumora Exhibit 53, a book entitled, *Basic Boardmanship*, which exhibit was not admitted in evidence by the referee, wherein it is stated:

"For a board and a superintendent to get along harmoniously, they must clearly understand their respective functions. It must be recognized that the board's respon-

sibility is to make, but not to carry out policies; the superintendent's responsibility is not to make, but to carry out policies."

The same principle is set forth in the regulations of the board (Rumora Exhibit 15, page 2) in the following language:

"In general the Board shall determine what shall be done, establish procedures for accomplishing the tasks, select a Superintendent and deliver to him the placing of plans and policies into operation, and providing the financial means for this achievement."

The referee found the adoption of the organizational chart to constitute an abuse of discretion and not to be a reasonable board regulation. The court disagrees. Basically, the new organizational chart established a chain of command for the school system. The chart indicated the board of education as the head of the school system, with the superintendent under the board and responsible thereto. Under the superintendent there were two basic supervisory assistants: (1) the business manager in charge of business affairs and supervising noneducational personnel, and (2) the assistant superintendent in charge of educational matters and supervising certificated and other educational personnel. Under the assistant superintendent were the principals, who in turn were supervisors over the teachers and other educational personnel at the schools. The assistant superintendent was directly responsible to the superintendent. Apparently, the disagreement was as to whether or not the assistant superintendent should be supervisory over the principals or whether they should be directly supervised only by the superintendent. The court finds that this is a matter lying within the sound discretion of the board of education.

The assistant superintendent, by the very nature of his position, necessarily performs functions that otherwise would be performed by the superintendent himself. The determination of whether or not to have an assistant superintendent is a matter lying within the sound discretion of the board of education. R. C. 3319.02 provides that the

board of education "may appoint one or more assistant superintendents and such other administrative officers as are necessary." The only limitation upon this discretion of the board is that the appointment of an assistant superintendent must be made upon nomination of the superintendent. A necessary part of the determination by the board whether to have one or more assistant superintendents is determination of the functions necessary to be performed by such an assistant superintendent. These, of course, may be changed from time to time by the board.

The board sets forth the general policy as to the responsibilities of the assistant superintendent; whereas, the superintendent implements that policy and supervises the assistant superintendent who is answerable to him. The adoption of the organizational chart in no way diluted any control that the superintendent may have been granted either by statute or by the board over the school system. Rather, the superintendent retained any and all control that he might otherwise possess. The new chart merely delineated a chain of command and the general duties of the assistant superintendent in performing the function of being an assistant superintendent.

The adoption of the organizational chart could be considered an abuse of discretion only if it be determined that the board of education has no voice, whatsoever, in determining the duties of supervisory personnel appointed by it. However, the court finds that the power of the board of education to provide for the government of its employees and the management and control of the schools necessarily includes a determination as to the general duties and areas of responsibilities to be performed by administrative personnel which the board determines to be necessary for the school district.

Another area of contention was a determination by the board, following negotiations by the negotiating committee, to grant three-year limited contracts to principals who have served three years as a principal in the district. Plaintiff repeatedly stated his feeling that this was illegal and that it was his sole prerogative to determine the length

of the contract of a principal and insisted upon recommending one-year limited contracts despite the board action.

The statutes are quite clear that it is the board, not the superintendent, who appoints principals. R. C. 3319.02 provides that:

"The board of each city, * * * school district shall appoint principals for all high schools and for such other schools as the board designates. * * *"

This power of the board is limited only by R. C. 3319.07 which provides that no principal "shall be employed unless such person is nominated by the superintendent of schools of such district." In addition, R. C. 3319.02 provides that:

"* * * In the case of assistant superintendents appointments shall be made, and in the case of other administrative officers may be made, upon nominations of the superintendent of schools for a term not to exceed four years, except as authorized by sections 3319.08 and 3319.09 of the Revised Code."

R. C. 3319.09 defines teacher as used in R. C. 3319.08 to 3319.18 as including principals. R. C. 3319.08 provides:

"Contracts for the employment of teachers shall be of two types, limited contracts and continuing contracts. A limited contract for a superintendent is a contract for such term as authorized by Section 3319.01 of the Revised Code, and for all other teachers for a term not to exceed five years. * * *"

It is unnecessary to determine whether contracts for principals fall within the purview of R. C. 3319.02 or 3319.-08, or both. In either event, the board possesses the power to enter into a limited contract with a principal for a term of three years.

The only question is whether the board is limited to entering into a one-year limited contract with a principal unless the superintendent recommends a longer term of contract. There is nothing in the statutes indicating that the superintendent has any statutory duty with respect to the length of a limited contract except in instances where the superintendent recommends reappointment of a teacher

eligible for a continuing contract under a limited contract for a term not to exceed two years pursuant to R. C. 3319.11. In all other instances, the function of the superintendent is to nominate a person as principal.

In other words, the only limitation upon the power of the board to appoint and enter into a contract, for a term authorized by law, with a principal, is that the person appointed must be nominated by the superintendent. The superintendent neither appoints principals, nor determines the term of the limited contract of the principal; rather, he merely nominates a person to be appointed by the board as principal for whatever term the board determines to be appropriate within the applicable statutory limitations as to duration. This does not necessarily mean that the superintendent may not make the recommendation as to the term of such a limited contract nor that the board may not seek the superintendent's counsel and advice with regard thereto. However, the responsibility for determination of the term of the limited contract remains exclusively with the board of education.

The fifth allegation of misconduct alleges that plaintiff refused to comply with a board directive to appoint a principal at the Plymouth Elementary School. This allegation cannot support any type of misconduct on behalf of plaintiff, for the reason that a superintendent has no power to appoint a principal for any school, such power resting with the board of education. R. C. 3319.02 specifically provides that:

"The board of each city, * * * school district shall appoint principals for all high schools and for such other schools as the board designates. * * *"

While, as indicated above, the person to be so appointed must be nominated by the superintendent pursuant to R. C. 3319.07, the power to appoint a principal for a school rests exclusively with the board of education.

The record indicates that the board of education had appointed a part-time principal at the Plymouth school. A request was made by parents of children attending that school that a full-time principal be appointed. The board

took no definitive action on this request. However, it appears that informally a majority of the members of the board indicated a desire to comply with the request. The superintendent recommended that the part-time principal be made full-time principal and that he be relieved of his other position in the system's audio-visual aid department. The board of education rejected this recommendation by refusing to act thereon.

It appears that despite this inaction by the board, plaintiff carried his recommendation into effect. It also appears that the majority of the board desired another person to be made principal of the Plymouth school and that plaintiff, at a public meeting, stated this person did not have a proper certificate to be a principal, but, when shown that the person in fact had recently received a certificate to be a principal, made improper public comments at the public meeting that such certificate was illegal. However, the superintendent was not required to recommend that person as principal for the Plymouth school nor could the board direct him to do so, nor did it attempt to direct him to do so.

The sixth allegation of misconduct charges that plaintiff refused to recognize and comply with a board directive to recommend a person to fill the vacant position in the system's audio-visual aid department. This is related to the fifth allegation in that the "vacancy" occurred by plaintiff's attempting to make a full-time principal out of the person appointed by the board as a part-time principal at Plymouth school. Apparently, the board had appointed the person in question as supervisor of audio-visual and instructional materials. The minutes of the April 11, 1972 board meeting indicate that the superintendent recommended the following transfer:

"Mr. Kenneth J. Weir from Supervisor Audio-Visual & Instructional Materials one-half time and Principal, Plymouth Elementary School one-half time to Principal Plymouth Elementary School full-time effective 4-3-72, same salary level."

The board disapproved this transfer by failing to act thereon. A motion to approve the transfer was made but

failed for lack of a second. Accordingly, the transfer was not effected. Since the transfer was not effected, there was no vacancy to be filled. This is true even though plaintiff, as superintendent, attempted to effectuate the transfer contrary to board action.

It is unclear whether the part-time position of supervisor in the audio-visual aid department was an administrative office pursuant to 3319.02 or a supplemental duty pursuant to R. C. 3319.08. The court assumes the former.

This is predicated in part upon the salary schedule (Rumora Exhibit 15, page 54) which indicates that the audio-visual supervisor is a part of ''Central Staff'' and is to receive a higher salary than an elementary school principal.

The superintendent possesses no power to remove a person appointed by the board to a position in the school system and transfer him to a different position. While R. C. 3319.12 recognizes that such transfers may be made, it is clear that such transfers must be effected by the board, not the superintendent. Also, R. C. 3319.02 provides that the board shall appoint principals for high schools and such other schools as it designates. The board appoints principals for a school, not generally for the school system. The superintendent possesses no power to revoke or countermand the appointment by the board either of supervisory personnel or of a principal for a school.

The regulations of the board (Rumora Exhibit 15, page 49a) provide that principals, assistant principals, and other professional staff employees, ''shall be employed, transferred between assignments, or promoted by the Board of Education, upon recommendation of the Superintendent of Schools.'' This is consistent with the statutory provision. Plaintiff followed this provision in making a recommendation to the board but apparently ignored it in attempting to effectuate the transfer without board approval.

The thirteenth allegation alleges that plaintiff indulged in ''persistent attention to and influence of one board member to the exclusion of the other four remaining board members.'' The record reveals some basis for this allegation. However, it is unclear whether this attitude emanated

from plaintiff or from the "minority" board member. There was a quite apparent four-to-one split on the board. In almost every instance, where the majority of the board disagreed with the superintendent, the "minority" member sided with the superintendent. (The instances of disagreement between the board and the superintendent were relatively few in relation to the total of the matters considered by the board, with the board following the recommendation of the superintendent in most instances.)

Plaintiff testified that he and the "minority" board member, Mr. Robinson, were social friends, in addition to their official relationship, and have been guests in each other's homes. Plaintiff also testified that he had some apprehension about the new board which took office on January 1, 1972. When asked if at that time he had come to the conclusion that Mr. Robinson was his only friend on the board, he answered, "Well I don't know that I came to the conclusion, I had some apprehension about the new Board coming in. * * *" Plaintiff testified that he discussed this apprehension with Mr. Robinson and stated that, "* * * I believe he (Robinson) reckoned that if a four-one situation were to develop not too much could be accomplished that it should be a situation where we tried to form a partnership that would work." (TR XI-119) He repeated a similar statement (TR XI-120) stating, "* * * I know whatever discussion we had was one of my trying to build a partnership that would, you know, would work, would be allowed to go."

Unfortunately, it is not clear as to what plaintiff meant by forming a partnership, or with whom. In any event, the partnership concept was discussed only with Mr. Robinson. At the ensuing board meeting, Mr. Robinson voted "no" on almost every organizational issue, and at the next meeting voted "no" on the issues of the organizational chart and the duties of the assistant superintendent. These hardly seem consistent with forming a partnership that "would be allowed to go." However, these actions were on the part of Mr. Robinson; and there is no direct evidence in the record that Mr. Rumora, the plaintiff, had any

influence with Mr. Robinson with respect thereto.

While, as indicated above, the feeling of the majority of the board that there was some type of collusion between plaintiff and Mr. Robinson is understandable, this falls within the area of speculation or suspicion, not evidence. Since this type of collusion involves a matter of intent, it must be established by circumstantial evidence, unless admitted by the person involved. The circumstantial evidence herein is insufficient to prove any more than a suspicion that such a collusion existed. The evidence falls short of proving that such a collusion did in fact exist.

R. C. 3319.16 provides that plaintiff's contract could be terminated only "* * * for gross inefficiency or immorality; for willful and persistent violations of reasonable regulations of the board of education; or for other good and just cause. * * *" There is no allegation of immorality. In *Hale* v. *Board of Education* (1968), 13 Ohio St. 2d 92, Chief Justice Taft stated in the opinion at page 98 that:

"In construing the words, 'other good and just cause,' we note that they are used with the words 'gross inefficiency or immorality' and 'willful and persistent violations' of board regulations. In our opinion, this indicates a legislative intention that the 'other good and just cause' be a fairly serious matter. * * *"

The rule of *ejusdem generis* is applicable to R. C. 3319.16. As stated in 50 Ohio Jurisprudence 2d 302 (Statute section 320):

"In accordance with what is commonly known as the rule of ejusdem generis, where, in a statute, general words follow a designation of particular subjects or classes of persons, the meaning of the general words will ordinarily be construed as restricted by the particular designation and as including only things or persons of the same kind, class, or nature as those specifically enumerated unless there is a clear manifestation of a contrary purpose. * * * In accordance with the rule of ejusdem generis, such terms as 'other,' 'other thing,' 'others,' or 'any other,' when preceded by a specific enumeration, are commonly given a restricted meaning, and limited to articles, things, or mat-

ters of the same nature as those previously described.''

See also the second paragraph of the syllabus of *State
v. Aspell* (1967), 10 Ohio St. 2d 1, which states:

''2. Under the rule of *ejusdem generis*, where in a
statute terms are first used which are confined to a par-
ticular class of objects having well-known and definite
features and characteristics, and then afterwards a term
having perhaps a broader signification is conjoined, such
latter term is, as indicative of legislative intent, to be con-
sidered as embracing only things of a similar character
as those comprehended by the preceding limited and con-
fined terms.''

Accordingly, when dealing with conduct of an insub-
ordinate nature, such conduct must be considered in light
of the express language of the statute referring to willful
and persistent violations of regulations and must be of
a similar nature and gravity in order to justify termination
of a contract.

Unfortunately, many of the matters referred to in
testimony as ''directives'' of the board of education do not
appear in the minutes. However, this apparently is a re-
sult of the board, during most of the period of time in-
volved, conducting work sessions prior to public meetings
at which many matters were discussed. No minutes were
taken of these work sessions, and while it is unclear as to
whether they were open to the public generally, it appears
that representatives of the press were permitted to be
present at many of the work sessions. Plaintiff contends,
and the referee appears to have agreed, that a superin-
tendent can be held accountable only for matters which are
voted on by a board of education at a regular meeting of
the board and which appear in the minutes. However, a
superintendent who wishes to have a harmonious relation-
ship with a board of education will either carry out those
policies that he knows to be desired by the majority of
the board without formal action or will specifically request
formal action to protect himself. Plaintiff in some in-
stances did neither.

R. C. 121.22 does require that all meetings of any

board of any school district are "public meetings open to the public at all times." That section further requires that: "* * * No resolution, rule, regulation or formal action of any kind shall be adopted at any executive session of any such board * * *." The section does contemplate that a board of education may hold executive or work sessions so long as no resolution, rule, or regulation is adopted or formal action taken at such a meeting.

There may well be instances where the board and superintendent may discuss policy matters which do not require formal action by the board. Such a situation might include a request by the board that the superintendent make a report on a matter for consideration by the board by a certain date such as referred to in allegation 7. In other words, there may well be instances where the board may, in effect, "direct" the superintendent to render a report on a certain matter or take other action without the necessity of formal action by the board. What is required with respect to proper informal "action" is that it be the expression of the board rather than merely the expression of a member of the board. To constitute the expression of the board, it must clearly be the expression of the majority of the board.

While the court has not discussed specifically some of the evidence concerning alleged failures of the plaintiff to comply with the desires, directives, and regulations of the board, the court has reviewed all of those matters. Taken singly or as a whole, the court finds that, although plaintiff might well be considered insubordinate to the board on occasion, such conduct was not of sufficient gravity to justify termination of his contract. Such conduct of plaintiff, although not justified, cannot be considered to have been willful and persistent. Most of the conduct resulted from plaintiff's misconception of the function of the superintendent and of the relationship between the superintendent and the board of education. The president of the school board specifically testified that no one doubted the sincerity of plaintiff.

In other words, although the evidence presented in

support of allegations 1, 2, 3, 5, 6, and 13 indicates questionable conduct on the part of plaintiff, it does not show misconduct of a sufficiently serious nature to justify termination of his contract pursuant to R. C. 3319.16.

At this point the court will comment upon a statement by the referee, during his discussion of the first allegation, which the court is unable to find support from the record. This is the statement of the referee that ''Candela's involvement was so total that his testimony in this matter was entitled to no meaningful belief except in those instances where it was collaborated by other evidence or bordered on constituting an admission against interest.''

As to involvement, this was true of most, if not all, of the witnesses. No one's involvement was any greater than that of plaintiff. However, the fact that a witness is involved does not mean that his testimony must *ipso facto* be disbelieved. Rather, his testimony must be weighed in light of the perspective which he has which is necessarily reflected from the evidence. People tend to view matters from a subjective rather than an objective point of view. Obviously, all witnesses' testimony is colored by their subjective view of that which transpired no matter how hard they try to be objective. People tend to remember those matters which they deemed important at the time from their own personal viewpoint, and to forget, or have hazy recollection, of matters which they deemed unimportant at the time. This was true of all of the witnesses in this case, as it is usually true of witnesses. However, this does not justify the complete rejection of the testimony of a witness. Rather, the trier of the facts must try to put all of the evidence together, recognizing the bias of witnesses, and from this evidence reach a factual conclusion objectively.

The referee did indicate that he considered Mr. Candela to have been impeached by instances of evidence introduced contradictory to Mr. Candela's testimony on remote collateral issues. Such evidence should not have been admitted, inasmuch as independent evidence on collateral issues for the purpose of impeachment of a witness are or-

dinarily not admissible. Furthermore, neither instance was of sufficient magnitude to justify complete impeachment of Mr. Candela's testimony. Furthermore, all involved semantical problems and questions of intent: whether Candela had accurately answered an ambiguous question concerning prior complaints, whether Candela had intended to indicate only partial or exclusive blame for the difficulty in a statement to the minority board member, and whether Candela participated in a decision or had only been advised thereof and attended a meeting. To quibble over what Candela meant and over the semantical differences is no basis for impeachment. The referee also referred to Mr. Candela's lawsuit and of his open campaigning in November 1971 for two candidates for member of the school board who in turn had previously supported Mr. Candela for superintendent. While the wisdom of a superintendent or assistant superintendent campaigning for election of board members may be questioned, the fact that an assistant superintendent did so does not impeach his testimony.

The most that the evidence can be said to indicate is a suggestion of bias on the part of Mr. Candela which might color his recollection and testimony as indicated above. However, this was true of almost every other witness who testified and was especially true of the plaintiff, Mr. Rumora. There were almost no unbiased third-party witnesses. This made it difficult for the court, and undoubtedly the referee as well, to sift through the voluminous record in order to make a factual determination; however, it does not justify the singling out of one witness and indicating complete impeachment of his testimony.

The court will now turn to consideration of the eight allegations which it considers to raise the issue of gross inefficiency. These are allegations 4, 7, 8, 9, 11, 12, 14 and 15 which read as follows:

"4. Your willful, arbitrary and irresponsible refusal to properly promote and place into operation the Board's adopted program and directives to involve the school system in the Summer Encampment Program; an attitude that:

"a) lost this school district hundreds of thousands of dollars in available funds; and

"b) alienated to the staffs of other local agencies involved in the program.

"7. Your failure to respond to a Board directive to submit a written report on the physical plan needs of this school system by April 1, 1972.

"8. With reference to the physical plant requirements of the school, your failure to follow Board directives and specific instructions on the suggested modifications and changes in the proposals made by the Board's consulting architects.

"9. Your failure to prepare and respond to a Board directive to recommend a plan to modify or retain the six period day.

"11. Your repeated breaches of the confidence and trust placed in you by the Board by publically speaking on issues of confidence between the Board and yourself.

"12. Your failure to act professionally in dealing with members of the Administrative staff, including the delegation of responsibility.

"14. Your failure to assert and accept your role as the professional educational leader in the community.

"15. An overall pattern of behavior on your part that created a loss of community confidence and respect in its Board of Education."

With respect to the fourth allegation, the evidence does not prove that the Summer Encampment Project was abandoned solely because of conduct of plaintiff. It is unclear from the evidence, due to the difficulties and delays in establishing the program, that it ever could have become operational for that summer. However, the evidence does show some childish behavior on the part of plaintiff.

The program was one which was to be partly financed by non-school agencies. Connected with one of these agencies was a Mr. Lechowick who needed to obtain approval of the program in order to obtain the necessary financing. Apparently, this approval was obtained on or about June 19, 1972. One of the school principals, Mrs. Scricca, was ap-

parently chairman of the school planning committee. During the afternoon of June 19, she received a phone call from Mr. Lechowick's secretary that Mr. Lechowick would like a meeting set up as quickly as possible and requested that the board of education attend. Mrs. Scricca called the representative of another non-school agency involved; and from her conversation with him, a meeting was arranged for noon the next day at Garfield's restaurant. Mrs. Scricca notified Mr. Lechowick's office thereof, and also called the president of the school board, asking him to attend. She did not call plaintiff with regard to the meeting.

Plaintiff was a member of the mental health board with which Mr. Lechowick was associated. That evening, June 19, there was a meeting of that board which was not held because of lack of a quorum. However, plaintiff and Mr. Lechowick discussed the matter of the results of Mr. Lechowick's trip to Columbus for approval. Plaintiff interpreted Lechowick's remarks as indicating he had not been successful. However, when plaintiff suggested that the program should be abandoned for the summer, Lechowick indicated in the negative and that he would make his report at a meeting of which plaintiff would be notified. (Lechowick did not testify but references to his statements were made by other witnesses.)

The meeting was held the next day without plaintiff's presence, although Lechowick inquired as to why he was not present; and the board president indicated that the meeting could proceed without plaintiff's presence. The following day Lechowick advised plaintiff that the meeting had been held and that the program was approved. On the following day, during a principal's meeting, plaintiff chastised Mrs. Scricca for not notifying him about the meeting.

On the day following that, at a meeting called to further implement the program, with members of the non-school agencies present, plaintiff refused to have anything more to do with the program because it was not under his control. referring back to his not being invited to the meeting at Garfield's. When asked if he knew that if he disassociated himself from the program, it would kill the program, he answered, "Precisely." Plaintiff claimed in testi-

mony that the remarks "were made in an effort to force the question to the board of education at a public meeting." The court finds this difficult to believe. Rather, this appears to have been merely childish behavior on the part, of plaintiff. The court feels that plaintiff was piqued, not so much because he was not invited to the meeting since he was fulfilling a commitment to speak at a Kiwanis meeting at the time of the Garfield meeting; but rather, because the board president was invited to the meeting while he, plaintiff, was not.

Plaintiff answered a "qualified yes" with an explanation to the question, "In other words, no matter how good. the program was for the school system, if it was not under your control, you would not approve it, is that right?" This points out what the court feels is one of the basic sources of the problem with which we are confronted. The majority of the board of education indicated a desire to exercise. greater control over the school system than plaintiff desired it to do.

Plaintiff was overly concerned with the extent to which he had personal control over the operation of the school system. It almost appears as if plaintiff felt himself in a competitive position with the majority of the board of education for control of the school system. As indicated above, the court has the distinct impression from plaintiff's testimony that he would not have objected to not having been invited to the meeting if the board president had not been. This competition for control is also demonstrated by other matters; for example, plaintiff's attitude towards the organizational chart and the principal's contracts.

Unfortunately, this competition was further fostered by the attitude and comments of the minority board member. The first suggestion that the board intended to discharge plaintiff came from the minority board member as an accusation several months prior to any action by the board, and prior to any real consideration thereof by the majority. of the board. Perhaps plaintiff's attitude may have a result of a feeling of insecurity in his position since only one of the three board members who voted to hire him remained on the board. It may have been further fostered by the

strong personality and somewhat officious attitude of the assistant superintendent.

Plaintiff did find himself in a somewhat difficult position. However, he should have known this when he accepted the position. Plaintiff resisted every action by the board which he felt minimized his control over the school system, and only reluctantly complied with board action, when he felt he had no choice. This could hardly have inspired in the majority of the board a feeling of confidence in plaintiff.

The seventh and eighth allegations both relate to plans for remodeling, reconstructing, and constructing school facilities in connection with a bond issue that was to be proposed. While the board desired a report by April 1, 1972, and plaintiff did not make such a report or explain the failure thereof; it was not feasible to submit such a report by that date. However, later, after tentative recommendations had been made by the consulting architects, but which involved too great an expenditure by approximately 10 percent, plaintiff asked the architects to revamp the plans to include a new middle school in the Saybrook area, which plaintiff knew, or should have known, that the board would not approve. No real reason as to why this almost last-minute change was asked by plaintiff is given, but the wisdom of the timing thereof is quite questionable.

The ninth allegation pertains to the six-period day at the high schools. Previously there had been an eight-period day, but upon plaintiff's becoming superintendent he recommended, upon recommendation of the teaching staff, a six-period day for the 1971-72 school year with a promise that he would investigate and report as to whether the eight-period day should be reestablished for the 1972-73 school year.

The evidence indicates that there was some conflict among the teaching staff as to the merits of the two plans. It appears almost to be a matter of convenience rather than an educational advantage. The eight-period day involves greater scheduling problems and more studyhalls for students, while the six-period day is easier to schedule. However, it is difficult to understand, as suggested by some witnesses, how the eight-period day would necessarily in-

volve more teachers or classrooms, since the same number of students must be in class somewhere under the supervision of the teacher during the entire school day, regardless of how many periods it is divided into.

Be that as it may, plaintiff testified that although he had not yet made a report, he had considered the matter and was planning to make a recommendation to the board at the time the board took action to consider termination of his contract. There is no contradiction, nor probably could there be, of this testimony of plaintiff.

The last four allegations in this series (allegations 11, 12, 14 and 15) are general allegations as to plaintiff's conduct. Suffice it to say, that the court does not find the evidence in support of these allegations sufficient to justify termination of plaintiff's contract.

Although the evidence does show some questionable conduct on the part of plaintiff, and some inefficiency on his part, the evidence does not show gross inefficiency on the part of plaintiff, nor any conduct of a sufficiently serious nature to justify termination of his contract within the limitations of R. C. 3319.16.

With regard to inefficiency, the key is the adjective "gross." To constitute gross inefficiency, the inefficiency must be flagrant, extreme, or complete. It is true that the board of education alleged other good and just cause in addition to gross inefficiency and willful and persistent violations of reasonable board regulations. However, since immorality is not alleged, such other good and just cause must be of a similar nature and seriousness as gross inefficiency and willful and persistent violations of reasonable regulations in order to justify termination of a contract. Were the criteria for termination of contract of a substantially lesser degree of seriousness, perhaps the board might be justified in the termination of plaintiff's contract. However, the court finds that the evidence presented in support of the fourteen remaining allegations, taken singly or as a whole, does not prove conduct on the part of plaintiff of a sufficiently serious nature as to justify termination of his contract pursuant to R. C. 3319.16.

In approaching this case from the standpoint of plain-

76

tiff's conduct, the court does not express approval, or disapproval, of the conduct of the assistant superintendent, the minority member of the board, nor the majority members of the board. The issue before the court was simply whether the conduct of plaintiff was such as to justify termination of his contract pursuant to R. C. 3319.16. The conduct of no other officer or employee of the school system was before the court for determination. However, it is apparent that an aura of suspicion and distrust permeated the administration of the school system. Probably all involved, to one degree or another, contributed to this. The function of the court herein is limited to a determination of whether the contract of plaintiff should be terminated. The court must leave to the elected representatives of the school district, the board of education, and its appointees, the operation of the school system with the hope that they will work together harmoniously, resolving their differences of opinion in a gentlemanly manner, and work towards the paramount purpose of the school system, the education of the students.

For the foregoing reasons, the court will enter judgment ordering that the resolutions of the board of education of August 15, 1972, and June 14, 1973, suspending plaintiff and terminating his contract of employment as superintendent for the board of education of the Ashtabula area city school district, be vacated and set aside; and that plaintiff, Jack Rumora, be reinstated to his position, as superintendent as of August 15, 1972. Inasmuch as they are neither expressly authorized by statute nor justified by the evidence before the court, plaintiff's request for attorney's fees is denied; but the costs of this proceeding shall be assessed against the defendant, board of education

*Judgment accordingly.*