**In re REMOVAL OF KUEHNLE et al.**

[Cite as *In re Removal of Kuehnle,* 161 Ohio App.3d 399, 2005-Ohio-2373.]

Court of Appeals of Ohio,
Twelfth District, Madison County.

No. CA2004–09–034.

Decided May 16, 2005.

400

402

404

Wildman Schooley, L.L.C., Eric M. Schooley, and Austin P. Wildman, for appellees.

Martin, Browne, Hull & Harper, P.L.L., and Lauren M. Ross, for appellants, Robert Kuehnle, Blenda James, and Angela Isaacs.

---

POWELL, Judge.

{¶ 1} Appellants, Robert Kuehnle, Blenda James, and Angela Isaacs, appeal a decision by the Madison County Court of Common Pleas removing them from the Madison–Plains School District Board of Education for gross neglect of duty, misfeasance, malfeasance, and nonfeasance pursuant to R.C. 3.07. We overrule the assignments of error asserted and affirm the judgment of the trial court.[1]

{¶ 2} Prior to the proceedings below, appellants were duly elected members of the Madison–Plains School District Board of Education. On August 2, 2004, a complaint was filed seeking the removal of four of the five members of the board. The board members sought to be removed were appellants and another board member, Sherry Kuehnle, who is the mother of appellant board member Robert Kuehnle.

{¶ 3} After an eight-day trial, the court below ordered appellants removed from office in a decision filed on September 27, 2004. The court found that appellant Blenda James had improperly voted in favor of supplemental contracts for her husband, Madison–Plains High School Principal James James, to serve as girls' and boys' tennis coach, and for the employment of her daughter, Andrea James, as a Madison–Plains High School teacher.

{¶ 4} The court found that appellant Angela Isaacs had obstructed an investigation by placing telephone calls to a Madison County Children Services Agency investigator who was investigating suspected child abuse by Madison–Plains special-education teacher and football coach Kenny Hinton.

{¶ 5} The court found that all three appellants had violated the Open Meetings Act, R.C. 121.22, improperly voted to place the entire authority of the board in a single member, and unlawfully continued to employ and pay two teachers, Andrea James and Kenny Hinton, who were not properly certified.

{¶ 6} Based upon the above findings, the trial court determined that appellants had engaged in misconduct sufficient to remove them from office. Pursuant to R.C. 3.10, appellants requested leave to file a notice of appeal to this court, and

---

1. We have sua sponte removed this case from the accelerated calendar.

leave was granted on October 21, 2004. Appellants subsequently filed briefs raising the following 14 assignments of error:

{¶ 7} Assignment of Error No. 1:

{¶ 8} "The trial court erred in concluding that the individual appellants violated the Open Meetings Act when the Board of Education went into executive session during eleven meetings in 2003 and 2004."

{¶ 9} Assignment of Error No. 2:

{¶ 10} "The trial court erred in concluding that the individual appellants violated the Open Meetings Act or the Public Records Act based on the contents of the minutes of certain meetings of the Board of Education."

{¶ 11} Assignment of Error No. 3:

{¶ 12} "The trial court erred in concluding that the individual appellants violated the Open Meetings Act or the Public Records Act when the Board of Education was delayed in formally approving its minutes in the spring and summer of 2004."

{¶ 13} Assignment of Error No. 4:

{¶ 14} "The trial court erred in concluding that the school district's continued employment and payment of teachers who did not complete the course work necessary to obtain their teaching certification by December 31, 2003 was a violation of law by the individual appellants."

{¶ 15} Assignment of Error No. 5:

{¶ 16} "The trial court erred in concluding that the Board of Education's February 18, 2004 resolution stating that 'when the Board of Education is not in session, the board president represents the board and has the authority of the full board' was a violation of law by the individual appellants."

{¶ 17} Assignment of Error No. 6:

{¶ 18} "The trial court erred in concluding that appellant Robert Kuehnle's actions after the Board of Education's February 18, 2004 resolution stating that 'when the Board of Education is not in session, the board president represents the board and has the authority of the full board' violated Ohio law."

{¶ 19} Assignment of Error No. 7:

{¶ 20} "The trial court erred in concluding that appellant Blenda James' vote to approve two supplemental coaching contracts for her husband and vote to employ her daughter amounted to misconduct."

{¶ 21} Assignment of Error No. 8:

{¶ 22} "The trial court erred in concluding that appellant Angela Isaacs' telephone call to a children's services investigator amounted to attempted obstruction of an official investigation."

{¶ 23} Assignment of Error No. 9:

{¶ 24} "The trial court erred in relying on a tape recording of telephone call appellant Angela Isaacs made to the county sheriff on a topic unrelated to the children services investigation of Kenny Hinton when the court had ruled at trial that the tape was only proffered and not admitted as evidence, as supposed proof of her intent to obstruct the children services investigation."

{¶ 25} Assignment of Error No. 10:

{¶ 26} "The trial court erred in permitting the trial to proceed against all four respondents together."

{¶ 27} Assignment of Error No. 11:

{¶ 28} "The trial court erred in permitting complainants to subpoena respondents and question them on cross-examination as part of complainants' case in chief."

{¶ 29} Assignment of Error No. 12:

{¶ 30} "The trial court's solitary and out of court questioning of two witnesses—the Madison County Sheriff (who was on complainants' witness list but ultimately not called as a witness) and a lieutenant in the Sheriff's Office who had already testified and been excused, and the court's reliance on unsworn hearsay statements of the lieutenant, as supposed proof of appellants' intent and bad faith."

{¶ 31} Assignment of Error No. 13:

{¶ 32} "The trial court erred in relying on hearsay statements contained in an after the fact memorandum written to a lieutenant in the Madison County Sheriff's Office by Kara Alexander, a school employee, about the investigation of the misconduct of fellow school employee Kenny Hinton when Alexander did not testify at the trial as supposed proof of appellants' intent and bad faith in their actions regarding Kenny Hinton."

{¶ 33} Assignment of Error No. 14:

{¶ 34} "The trial court erred in finding misconduct on the part of appellants in areas where they relied on advice of legal counsel for the Board of Education."

{¶ 35} Removal of three elected officeholders from a single school board is possibly an unprecedented event in the state of Ohio. The facts underlying this case are complicated and at times confusing. Also, given the short time period required by the removal statutes, the arguments and evidence are perhaps not as

fully developed as would be expected in a proceeding of this magnitude. The trial court filed a lengthy decision that exhaustively details the facts and applicable law. This court will recount the facts in part below and then as necessary address the assignments of error.

{¶ 36} Appellant Robert Kuehnle was elected to the Madison–Plains School District Board of Education in November 2001. He graduated from Madison–Plains High School in 1995. During high school, Kuehnle worked in a store, "Eats & Treats," located in Grove City, Ohio, that was owned by James and Blenda James. James James is the principal of Madison–Plains High School; Blenda James is a Madison–Plains School Board member and one of the appellants herein.

{¶ 37} After graduating from college, Kuehnle worked in St. Louis for two years before returning to Ohio to live with his mother, Sherry Kuehnle, a three-term Madison–Plains School Board member who was named in the underlying complaint but not removed from office.

{¶ 38} Robert Kuehnle was a high school classmate of Andrea James, who is the daughter of James and Blenda James and who, until she resigned, was a Spanish teacher at Madison–Plains High School. Kuehnle is "good friends" with the James family. He testified that he and the James family have taken vacations together, go to dinner together, and have been on the same bowling team.

{¶ 39} Appellant Blenda James was also elected to the Madison–Plains School District Board of Education in November 2001. She is the wife of Madison–Plains High School Principal James James and the mother of former Madison–Plains High School Spanish teacher Andrea James. As indicated above, Blenda James, her husband, and her daughter are good friends of Kuehnle.

{¶ 40} Appellant Angela Isaacs was elected to the Madison–Plains School District Board of Education in November 2001, the same year that Kuehnle and Blenda James were elected to the board.

{¶ 41} Daniel Shull was hired as superintendent of the Madison–Plains School District in July 2002. At that time, the five-member Board of Education consisted of appellants, Anthony Kirshner, and Sherry Kuehnle. In January 2004, Kirshner was replaced by Michael Brandt. The record reflects that the relationship between the board and Superintendent Shull did not begin smoothly and progressively deteriorated until Shull was placed on administrative leave in April 2004 and later terminated. Issues of contention between Superintendent Shull and appellants included teacher-contract negotiations, teacher certification, school finances, public debate surrounding a bond levy, and the closing of an elementary school.

{¶ 42} The board and Shull also had differences with respect to· Shull's "management style," including the amount of time Shull should spend at each school and the extent Shull should be involved with management of individual schools. There was also disagreement with respect to the employability of one of the high school Spanish teachers, Andrea James, and the high school football coach, Kenny Hinton, who was also a special-education teacher.

{¶ 43} The conflict between the board and Superintendent Shull was particularly intense with respect to the three appellants herein. On February 18, 2004, the board passed a resolution stating that when the board was not in session, "the board president represents the board and has the authority of the full board." The motion was made by Kuehnle and seconded by Blenda James. Four of the five board members, i.e., appellants and Sherry Kuehnle, voted in favor of the resolution.

{¶ 44} The above resolution was the culmination of an ongoing dispute between board members and Superintendent Shull, which centered around whether Shull could be ordered to take action by individual board members. In response to orders from individual board members, particularly Kuehnle, Shull had caused a letter to be written to Kuehnle as president of the board by Kimball H. Carey, legal counsel to the Buckeye Association of School Administrators, a professional association. Carey's letter advised that "a superintendent of schools is not obligated to follow the directives of individual board members where it does not appear that such directives have in some fashion been authorized by the board of education as a whole * * *." As Kuehnle testified, the February 18, 2004 resolution was a "wake-up call to tell the superintendent that he did have to listen when a board president said: Do this you know you will do this [sic]."

{¶ 45} Kenny Hinton and Andrea James are central figures with respect to many of the allegations made in the complaint and the conflict between appellants and Superintendent Shull.

{¶ 46} Hinton was hired by an interim superintendent in the summer of 2002 as the high school football coach. Hinton was told that the school would look for a teaching spot for him. The interim superintendent subsequently recommended that Hinton be placed as a special-education intervention specialist to assist special-needs students. At the time he was hired, Hinton was certified only as a substitute physical education teacher. When Superintendent Shull discovered that Hinton was not certified as a special-education intervention specialist, he asked Hinton to resign the position. Hinton did so and was reassigned as a long-term substitute subject to working toward certification as an intervention specialist.

{¶ 47} The record reveals that Hinton was well thought of as a football coach. He is referred to in the record several times as "the best football coach Madison–

Plains ever had." However, Hinton's record as an intervention specialist was less distinguished. In a series of memoranda beginning in April 2003, Cara Alexander, Director of the Madison–Plains Department of Special Education, chronicled Hinton's deficiencies as an intervention specialist and his inability to manage his classes and students. The model procedures for the education of children with disabilities, which were adopted by the Madison–Plains School District Board of Education as required by law, require that the school district "employ personnel to meet the needs of children with disabilities that have appropriate certification or licensure as defined by Chapter 3301–24 of the Administrative Code."

{¶ 48} Students for which Hinton was responsible were failing. Hinton was not attending classes with them to help them succeed. Hinton failed to turn in "intervention logs" detailing his efforts to help failing students. He was also asked to turn in detailed lesson plans for these students, but he did not. Hinton also did not send out interim progress reports to the parents of failing students as instructed. In one instance, Hinton failed, without explanation, to attend a meeting requested by the mother of a student who was failing or nearly failing classes for which Hinton was responsible.

{¶ 49} The record indicates that in addition to not helping his students, Hinton routinely and repeatedly permitted "non-IEP"[2] students to use his classroom, even though he was directed not to do so on numerous occasions by Alexander and others. Allowing non-IEP students in the classroom caused the IEP students to feel uncomfortable and embarrassed when seeking help. Hinton's classroom allegedly featured a "party atmosphere" and was referred to occasionally as "club 185" (the room number was 185).

{¶ 50} Alexander observed in one memorandum that "it is very rare to have a student on an IEP fail if the IEP is being implemented and the student is working on their academic level." As noted, Hinton's students were failing, and the record indicates that he was not making the necessary effort to improve the situation. The school board, including appellants, knew that Hinton was having trouble in the classroom and about his certification problems by the end of the 2002–2003 school year.

{¶ 51} On May 20, 2003, prior to the 2003–2004 school year, Superintendent Shull wrote Hinton and told him what was necessary for Hinton to become certified as an intervention specialist for the coming school year. Hinton was required to complete six hours of course work in an approved program leading to

---

2. Special-education students generally do not follow the curriculum that other students do; they are assigned an Individualized Education Plan ("IEP") that they are expected to follow. IEPs are developed by the child's parents and teachers and document the child's present level of performance, set goals for learning, and specify additional services required by the child.

an intervention-specialist license and fill out another application and submit it with an original transcript of course work taken. Hinton was told that these tasks needed to be done "in order [for him] to return as an employee of Madison–Plains local schools."

{¶ 52} When the 2003–2004 school year began, Hinton had not done the work necessary to become certified as an intervention specialist. Despite Hinton's problems during the prior school year, which were either ignored or found to be of minor consequence, the school board, led by appellants, allowed Hinton additional time to become certified. In the interim, Shull was told on several occasions to "stop harassing" Hinton and not interfere, even though Hinton's failings with respect to his students continued and were being documented by Alexander. High school principal James James and appellants insulated Hinton from scrutiny, discipline, and professional accountability.

{¶ 53} On September 5, 2004, Shull reported to the school board that Hinton had not taken the six classroom hours needed to be rehired as a certified intervention specialist. Shull reported that Hinton "said he got confused and then decided not to take the courses he said he was taking." On November 21, 2003, Shull, as a result of receiving updates from Alexander concerning Hinton's performance deficiencies, advised the board as follows: "Received a call for assistance/counsel concerning intervention specialist [Hinton] not following compliance issues, meeting and helping assigned students, missing meetings. I suggested she [Alexander] document the incidents and copy to High School Administrators."

{¶ 54} Despite the existence of numerous documents detailing Hinton's deficiencies and the fact that he had misled school administrators by indicating that he had taken courses required to become certified as an intervention specialist, the school board permitted Hinton to continue teaching at Madison–Plains and told him to complete his certification requirements by December 31, 2004. Kuehnle told Shull that he should stay out of the high school and leave Hinton alone. Angela Isaacs told Shull to stay out of the high school.

{¶ 55} When Shull indicated that there might be a problem with paying Hinton because he was teaching classes he was not certified to teach, the school board, through appellants, indicated that they did not believe him. Hinton continued to mislead Shull and other school officials about the status of his course work. During February 2004, Hinton essentially forged his grades and submitted them to Shull. He later told Shull he was providing an "estimate" of his grades.

{¶ 56} In addition to certification issues, Hinton was suspected of child abuse. On February 18, 2004, Alexander received a phone call from Sally Warner, a Madison–Plains High School guidance counselor, indicating that the mother of a female student had indicated that she had seen e-mails on her home computer

from Hinton to her daughter that were personal in nature and referred to sex. Alexander immediately met with Shull. It was decided that since James James was the high school principal, Shull would immediately inform James of the situation and ask him to investigate.

{¶ 57} When Alexander called Warner to tell her what was being done, Warner indicated that she had already informed James. Warner further stated that James was very angry that Warner had told Alexander and that James stated that Alexander was "out to get Kenny" and would immediately go to Shull with the information. According to Alexander, James also stated to Warner that Hinton "had done nothing wrong, [they] were only out to get Kenny, and Kenny was the best football coach Madison–Plains ever had."

{¶ 58} There was a school board meeting that evening, which Alexander attended. James again indicated how upset he was with Warner for calling Alexander and "making a big deal out of the situation." According to statements Alexander made to police officials, she had received prior complaints about Hinton's interaction with female students, but James and other school officials had indicated that Hinton was a popular teacher with the students and that there were no problems.

{¶ 59} Warner's meeting with the female student's parents regarding the e-mail from Hinton occurred on February 18, 2004. As detailed above, Principal James James was notified of the situation that same day by Shull. Later that morning, Shull told James to begin a full investigation of the allegations concerning Hinton and followed the request with a letter. Although the letter did not articulate the gravity of the allegations against Hinton and his suspected inappropriate relationship with the female student, it is clear from the record that James appreciated the nature of the situation and the scope of the investigation. Shull testified that he had the best interest of the Madison–Plains School District in mind when he only alluded to the possible relationship between Hinton and the female student in the letter; he stated that his intent was to protect all concerned in the event the investigation determined that Hinton had done nothing wrong.

{¶ 60} James completed his investigation on the same day it was assigned. The investigation consisted of speaking with the mother of the student who received the e-mail from Hinton and speaking with Hinton personally. James concluded that "[b]ased upon the information I have obtained, I feel there is no reason to pursue this matter * * *." James again appeared most concerned that the matter was not reported to him first and "then to others as appropriate." A significant portion of James's investigation was dedicated to his "concern in how this whole matter was handled."

{¶ 61} Despite James's investigation and communications from appellants urging him to "let it go," Shull refused to do so. First, Shull knew that there had

been past allegations of improper conduct between Hinton and female students. Second, the Ohio Revised Code, R.C. 2151.421, requires certain officials and professionals who know or suspect that a child under 18 years of age has suffered or faces the threat of suffering abuse to immediately report that knowledge to authorities. Persons who have this duty to report include anyone who is a "school teacher; school employee; [or] school authority." R.C. 2151.421(A)(1)(b). Finally, Shull perceived a discrepancy between the result of James's investigation and the information he had personally received from talking with the child's parents and Warner and Alexander.

{¶ 62} Shull sought advice from the Madison County Prosecutor and others. Prosecutor Stephen Pronai advised him, as did Judy Saylor, Superintendent of the Madison–Champaign Educational Service Center, to contact Madison County Children Services and report the Hinton situation. Shull testified that although he "did not want to start another fight with the School Board," he felt that he had to report the matter to children services. He stated that he was surprised that James, as principal, had not done so upon learning of the allegations against Hinton involving female students.

{¶ 63} After contacting children services, Shull informed the school board of his actions and told them that he was attempting to secure copies of the e-mails between Hinton and the student. Shull testified that the next day he received a call from appellant Angela Isaacs "sharing with [him] that the investigation was supposedly over; Jim James was in charge of the investigation; [he] needed to quit calling children services and putting [his] spin on the activities, the whole story; let them do the investigation now that [he has] already contacted them, but [he is] not to call them again."

{¶ 64} An e-mail from Angela Isaacs to Shull on March 8, 2004 contained the following:

{¶ 65} "Regarding Kenny Hinton, unless there is proof of E-mails between the student and teacher (copies of the E-mails) and there is proof that he forged his grades (a statement from the University confirming that the grades he submitted were never his grades), I recommend we don't spend a lot of time re-hashing Mr. Hinton's situation tomorrow night [at the school board meeting]. * * * Mike Brandt [another school board member] said you had a conversation with the student's father regarding the inappropriate E-mails * * *. If they exist, then there is proof of inappropriate behavior and he should not be employed in our district (teaching or coaching). If they don't exist, then all we can go on is Mr. James' investigation report."

{¶ 66} At the March 9 school board meeting, James was told to reopen his investigation of Hinton.

{¶ 67} On March 12, 2004, Isaacs called Kathy Wolboldt, the children services investigator assigned to the case. She told Wolboldt that the board "had a problem with [its] superintendent." She asked what was going on in the Hinton investigation and wanted to know whether Shull had made the referral and when the referral was made. Wolboldt told Isaacs she was not at liberty to discuss the investigation and that the agency had received more than one complaint concerning Hinton.

{¶ 68} Forty-five minutes later, Isaacs again called Wolboldt to confirm that Hinton would not be on school grounds until the investigation was completed. She again warned Wolboldt that Shull "exaggerated stories" and stated that if there were two referrals, they probably both came from the same person, i.e., Shull. Isaacs asked Wolboldt to verify any information given to her by Shull with Principal James James. In other words, she told Wolboldt that Shull was not to be believed and that any information Shull gave should be verified with James James, who she knew believed that the allegations against Hinton were false.

{¶ 69} Wolboldt called Isaacs back 15 minutes later and attempted to focus Isaacs on the serious problem under investigation. She explained to Isaacs how pedophiles could also be professionals who place themselves in a position to have access to children. Wolboldt told Isaacs that she should be more concerned about the alleged victim than the source of the allegations of misconduct.

{¶ 70} As a result of all of this activity and other allegations, Hinton resigned his position with Madison–Plains schools on March 5, 2004. He never satisfactorily completed the courses required to become certified as an intervention specialist. He was later found to have engaged in inappropriate activities with female students.

{¶ 71} The situation involving Andrea James, a Spanish teacher at Madison–Plains High School, was similar to the Hinton situation with respect to certification. As noted above, Andrea James is the daughter of appellant, Blenda James, a school board member, and Madison–Plains High School Principal James James. She was also a high school classmate of Kuehnle, a school board member and close friend of the James family.

{¶ 72} Andrea James was hired by the school district as a high school Spanish teacher for the 2002–2003 school year. She held a five-year, long-term substitute teaching license in speech and communication. She had never taken any Spanish courses in college and by all accounts could speak, read, and write little, if any, Spanish.

{¶ 73} As he did with Hinton, Shull wrote a letter to Andrea James following the 2002–2003 school year detailing what she needed to do to become certified to

teach Spanish.[3]   Given her present qualifications, Shull informed her, "[W]e are not in compliance with the Ohio Department of Education by putting you in a Spanish Teacher position."   Shull told Andrea James "In order to be in compliance, and to return to Madison–Plains Local Schools for the 2003–2004 school year, you will need a Long–Term Substitute License in Spanish, which requires 20 semester hours of course work in Spanish or to be fully certified in Spanish."   Shull requested that Andrea James update him "periodically" on her progress.

{¶ 74} Shull's letter to Andrea James regarding certification, and his previously mentioned letter to Hinton on the same subject, prompted an e-mail response from Andrea James's mother, appellant Blenda James, then president of the school board:  "I understand that several teachers (those working on certification) received hand-delivered letters informing them they are not welcome back this fall?   Could not this have been done in a more non-threatening manner?   Such as calling each of them to try to work with them to get what they need?"

{¶ 75} A review of the letters sent by Shull indicates that the above reaction by Blenda James was not warranted;  however, it does convey that Blenda James intended to defend the teaching positions held by her daughter and Kenny Hinton.

{¶ 76} On August 7, 2003, Shull advised the board that he was waiting on notice from Andrea James that she had completed the required course work.   As with Hinton, the board directed him to give Andrea James until the end of December 2003 to satisfy requirements for certification.   Shull testified that in his experience, September 15 is usually the cutoff date for submission of course transcripts and other materials necessary for certification for the coming school year.   The record reveals that despite Shull's letter, Andrea James had enrolled in only eight semester hours of elementary Spanish, not enough to obtain certification.   She did not update Shull at all with respect to her efforts.

{¶ 77} As the trial judge observed, by the time the board met on October 21, 2003, Andrea James and Hinton were on parallel tracks.   Neither was qualified to teach in the areas they were teaching.   Neither had taken the course work necessary to maintain their employment, and neither was successfully engaged in activities necessary to obtain their certification.   Shull continued to demand professional accountability, and appellants continued to demand that Shull accommodate Andrea James and Hinton, despite the certification issues and complaints from parents and school administrators.

---

3.  Andrea James was teaching Spanish at Madison–Plains High School when Shull was hired in July 2002.   Shull testified that he did not know how Andrea James first became assigned to teach Spanish.

{¶ 78} Andrea James remained at Madison–Plains High School as a Spanish teacher until she resigned on January 24, 2004. Upon her resignation, she was rehired by the board as a short-term substitute teacher. Short-term substitutes are permitted by law to teach only five days in an area in which they are not certified. For the remainder of the 2003–2004 school year, Andrea James taught Spanish for five days as a substitute Spanish teacher, took one day off, and then taught Spanish for five additional days, continually repeating this pattern.

{¶ 79} At least one parent complained about the above arrangement: "What kind of education and preparation can be provided to a student, when their teacher is a short-term substitute lacking the proper requirements to teach the class * * *?" As with Hinton, appellants criticized Shull for "harassing" Andrea James about obtaining certification in the subject she was teaching.

{¶ 80} Aside from the issue of whether Andrea James and Hinton were qualified to teach, Shull further drew the wrath of appellants by questioning whether Andrea James and Hinton could be legally paid by the school district. Shull was concerned that if these teachers could not be paid by the district, he, members of the school board, or others might be personally liable for payments illegally made. He contacted several Ohio Department of Education officials about this matter. Although this issue was never completely resolved, there clearly was some argument that Andrea James and Hinton should not have been paid for teaching subjects for which they were not certified.

{¶ 81} The reaction of appellants to the certification/payment issue did not focus on the propriety of employing uncertified teachers or on whether paying them was legal or appropriate. First, appellants did not believe Shull's assessment of the situation or what Shull indicated he had been told by Department of Education officials. They asked him to submit documentation that there was a problem. Second, the school district treasurer was directed to continue to pay Andrea James and Hinton. Lorraine Bremer, Madison–Plains School District Treasurer from October 2003 to April 2004, testified that she was contacted by Robert Kuehnle on her first day of employment and told that she needed to continue to pay Andrea James.

{¶ 82} The voluminous record herein indicates that appellants, as members of the Madison–Plains School District Board of Education, for reasons apparent and perhaps for other reasons known to them alone, sought to protect Andrea James and Kenny Hinton and make sure that they remained in the employ of the Madison–Plains School District. They did this even though they were aware that Andrea James and Hinton were not properly certified to teach the subjects they were teaching, that there had been complaints about both teachers by parents of students and others, and that both had at least misled the school district and

administrators with respect to their attempts to obtain certification. They also knew Hinton may have been involved inappropriately with female students.

{¶ 83} Appellants instead focused on the superintendent, Shull. He was chastised for bringing the shortcomings of Andrea James and Hinton to their attention. They told him that he was "too involved" in the day-to-day operation of the district, that he needed to be "more laid back." Shull was told to stay out of the school buildings and was directed by Kuehnle, then the board president, to provide copies of all memoranda he sent to anyone and provide a copy of his daily schedule. When Shull took issue with these orders and others given to him by individual school board members, appellants passed a resolution stating that the board president (Robert Kuehnle) had the full power of the board when it was not in session. During his testimony, Kuehnle admitted that the resolution was passed because the board did not trust the superintendent and wanted to take over management of the schools.

{¶ 84} Appellants raise 14 assignments of error, which we will consider in the order they have been presented. However, before addressing the assignments of error, a few general observations are in order.

{¶ 85} Proceedings to remove a public officer are quasi-penal in nature and should be strictly construed. *2,867 Signers v. Mack* (1979), 66 Ohio App.2d 79, 20 O.O.3d 142, 419 N.E.2d 1108. The law does not favor the removal of a duly elected official. Id. at 82, 20 O.O.3d 142, 419 N.E.2d 1108, citing *State ex rel. Corrigan v. Hensel* (1965), 2 Ohio St.2d 96, 31 O.O.2d 144, 206 N.E.2d 563. The burden of proof that must be met before a public official can be removed is clear and convincing evidence. *McMillen v. Diehl* (1934), 128 Ohio St. 212, 190 N.E. 567. Clear and convincing evidence means that measure or degree of proof that is more than a mere preponderance of the evidence but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and that will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. *In re Election of November 6, 1990 for the Office of Atty. Gen. of Ohio* (1991), 58 Ohio St.3d 103, 569 N.E.2d 447. On appeal, this court must review the record to determine whether sufficient evidence was presented to satisfy the required degree of proof. *In re Wingo* (2001), 143 Ohio App.3d 652, 758 N.E.2d 780.

{¶ 86} "Gross neglect of duty" is more than mere neglect and occurs when such neglect of duty, either from the gravity of the case or the frequency of the instances, become so serious as to endanger or threaten the public welfare. *Vajner v. Orange* (1963), 119 Ohio App. 227, 27 O.O.2d 98, 191 N.E.2d 843. "Nonfeasance" is the omission of an act that a person ought to do; "misfeasance" is the improper doing of an act that a person might lawfully do; and "malfea-

sance" is the doing of an act that a person ought not to do at all. *State ex rel. Neal v. State Civ. Serv. Comm.* (1947), 147 Ohio St. 430, 34 O.O. 356, 72 N.E.2d 69.

{¶ 87} The law provides no clear guidance as to when misfeasance, malfeasance, or nonfeasance rises to the level of misconduct in office warranting removal. It is clear that one act of malfeasance alone can be grounds for removal and that willful action is not specifically required. *In re Removal of Ron Steed* (July 27, 1989), Lawrence App. No.1909, 1989 WL 411471. With respect to misfeasance, malfeasance, and nonfeasance, we agree with the trial court that all three require a substantial departure from what is required of a public official before they will result in removal. Removal is not to be ordered lightly for minor or isolated infractions. When determining whether removal is proper, all relevant circumstances surrounding the conduct in question should be examined, including the degree of wrongdoing and the number of incidents involved.

{¶ 88} It is equally clear that courts should not act as "super boards of education" and second-guess the decisions of a board of education absent an abuse of discretion. See *Clay v. Harrison Hills City School Dist. Bd. of Edn.* (C.P.1999), 102 Ohio Misc.2d 13, 723 N.E.2d 1149. Accordingly, to determine whether a school board member should be removed for misconduct in office on the basis of gross neglect of duty, misfeasance, malfeasance, or nonfeasance, the courts should determine whether the public officers in question acted in bad faith or committed such a gross abuse of discretion as constitutes a substantial departure from the faithful performance of duty. If school board members are found to have acted in such a manner, their conduct has risen to the level of misconduct in office, and they are subject to forfeiture and removal from office.

{¶ 89} R.C. 3313.10 provides that before entering upon the duties of office, each person elected or appointed a member of a board of education shall take an oath to support the Constitution of the United States and the Ohio Constitution and that he will perform faithfully the duties of office. The "operation goals" of the Madison–Plains Board of Education are as follows:

{¶ 90} "The primary responsibility of the board is to establish purposes, programs and procedures which produce the educational achievement needed by District students. The board must accomplish this while also being responsible for wise management of resources available to the District. The board must fulfill these responsibilities by functioning primarily as a legislative body to formulate and adopt policy, by selecting an executive officer to implement policy and by evaluating the results; further, it must carry out its functions openly, while seeking the involvement and contributions of the public, students and staff in its decision-making processes."

{¶ 91} The first assignment of error contends that the trial court erred by concluding that the individual appellants violated the Open Meetings Act when the board of education went into executive session during certain meetings held during 2003 and 2004.

{¶ 92} The trial court's opinion identifies ten school board meetings in connection with violation of Ohio's "sunshine law" and the requirements for executive session. R.C. 121.22 generally requires the meetings of public bodies to be public. R.C. 121.22(G) provides that nonpublic "executive sessions" may be held to consider certain specified matters, including consideration of the appointment, employment, dismissal, discipline, promotion, demotion, or compensation of a public employee or official, or the investigation of charges or complaints against a public employee or official. If a public body holds an executive session for one of the specified purposes, there must be a motion and vote to hold the executive session. The motion shall state which one or more of the approved purposes is the reason for the executive session. R.C. 121.22(G)(1).

{¶ 93} The statute requires a public body to specify, in detail, the stated purpose for holding an executive session, although the law does not require that the specific nature of the matter to be considered be disclosed. The exceptions contained in R.C. 121.22(G) are to be strictly construed. *Gannett Satellite Information Network, Inc. v. Chillicothe Bd. of Edn.* (1988), 41 Ohio App.3d 218, 534 N.E.2d 1239. Public agencies such as school boards are not permitted to conduct public business during executive sessions; business must be conducted in public before or after the executive session. See *Dayton Newspapers v. Dayton* (1971), 28 Ohio App.2d 95, 274 N.E.2d 766; *State ex rel. Humphrey v. Adkins* (1969), 18 Ohio App.2d 101, 47 O.O.2d 173, 247 N.E.2d 330.

{¶ 94} The school board meeting held April 29, 2003 began at 7:00 p.m. At 7:30 p.m., the board went to executive session for the purpose of discussing "employment of personnel, negotiations and legal matters." The executive session ended at 9:22 p.m. Between 9:22 p.m. and 9:25 p.m., the board adopted ten separate resolutions pursuant to a "consent agenda" without discussion or debate. These items included approval of a 2003–2004 school calendar, employment decisions and supplemental contracts involving nine employees, a motion to accept the resignation of one employee, and the acceptance of a second reading of a board policy involving summer schools.

{¶ 95} The school board meeting held on May 20, 2003 began at 7:00 p.m. The board went into executive session at 9:20 p.m. for the purpose of discussing "personnel employment and negotiations." The executive session ended at 10:15 p.m. Between 10:15 p.m. and 10:19 p.m., the board adopted a consent agenda, which included seven separate items and 34 supplemental bus driver contracts.

Other items approved under the consent agenda included hiring three employees, freezing the salary of two employees, accepting the resignation of two employees, accepting the third reading of the summer schools policy, and a resolution adopting Model Procedures for the Education of Children with Disabilities.

{¶ 96} The school board meeting held June 17, 2003 began at 7:00 p.m. At 8:55 p.m., the board entered executive session for the purpose of discussing "personnel, employment, negotiations, legal issues and supplemental contracts." Executive session ended at 10:20 p.m. Between 10:20 p.m. and 10:24 p.m., the board adopted a total of 21 items under a consent agenda. These items included employment of 17 summer school teachers and two other employees and supplemental contracts for James James for the 2003–2004 school year in the amount of $3,217 for head boys' tennis coach and $3,217 for head girls' tennis coach. The minutes of the meeting reflect that appellant Blenda James voted in favor of her husband's receiving these supplemental contracts.

{¶ 97} The school board meeting held July 15, 2003 began at 7:00 p.m. At 8:17 p.m., the board entered executive session for the purpose of discussing "personnel, unemployment, [and] negotiations." Executive session ended at 9:10 p.m. Between 9:10 p.m. and 9:12 p.m., the board considered new business and passed two resolutions under a consent agenda. One resolution contained 11 items, and the other contained three items. The items included employment of certain certified individuals and administrators for the 2003–2004 school year, accepting resignations of two employees, and approval of class fees and supplemental contracts for 57 individuals. Included were supplemental contracts for Andrea James: $1,158 for junior class advisor, $1,158 for homecoming advisor, and $1,158 for junior/senior prom advisor. Appellant Blenda James abstained from this vote.

{¶ 98} The school board meeting held September 16, 2003 began at 7:00 p.m. At 7:45 p.m., the board entered executive session for the purpose of discussing "personnel employment." Executive session ended at 9:00 p.m. Between 9:00 p.m. and 9:10 p.m., the board considered new business and passed one resolution under a consent agenda, which contained 20 items without discussion or debate. These items included approval of two teacher-employment contracts, seven supplemental contracts, approval of a volunteer assistant seventh-grade football coach, and approval of a service agreement with the Madison County Board of Mental Retardation and Developmental Disabilities for the 2003–2004 school year.

{¶ 99} The school board meeting held on October 21, 2003 began at 7:00 p.m. At 9:00 p.m., the board entered executive session for the purpose of discussing "personnel, employment, discipline and negotiations." It appears that the minutes reversed the end of executive session and the end of the meeting. Assuming that to be true, executive session ended at 9:49 p.m. Between 9:49 p.m. and 9:58

p.m., the board passed one resolution under a consent agenda that contained 11 items. The items included supplemental contracts for 11 teachers, authorization for senior English students to travel to England and Scotland, approval of bus routes and stops for the 2003–2004 school year, approval of the advertising for bids for two new buses, and approval of the first reading of the "Network Privacy and Acceptable Use Policy for Staff Members."

{¶ 100} The school board meeting held November 18, 2003 began at 7:00 p.m. At 7:55 p.m., the board moved into executive session for the purpose of discussing "personnel, employment, compensation, negotiations." Executive session ended at 11:05 p.m. Between 11:05 p.m. and 11:09 p.m., the board considered new business and passed two resolutions containing a total of 12 items. These items included the second reading of the Network Privacy and Acceptable Use Policy for Staff Members, approval of a seventh- and eighth-grade boys' basketball volunteer, acceptance of bids to purchase two buses, and supplemental contracts for six employees.

{¶ 101} The school board meeting held on December 17, 2003 began at 7:00 p.m. The board entered executive session at 7:47 p.m. for the purpose of discussing "personnel, employment, negotiations, and legal issues." Executive session ended at 9:30 p.m. Between 9:30 p.m. and 9:35 p.m., the board considered new business and passed one resolution containing 14 items under a consent agenda. The items included the third reading of the Network Privacy and Acceptable Use Policy for Staff Members, accepting the resignations of three employees, granting an extension of the time frame with regard to a collective bargaining agreement relationship with one employee, approval of nine supplemental contracts, and the approval of tutor contracts for seven individuals.

{¶ 102} The school board meeting held on February 18, 2004 began at 7:00 p.m. After approving minutes from the last meeting, at 7:27 p.m. the board moved into executive session for the purpose of discussing "personnel and legal matters." Executive session ended at 9:48 p.m. Between 9:48 p.m. and 9:55 p.m., the board passed seven motions. Notably, the board passed Resolution 29–04, which provided that when the board of education is not in session, the board president represents the board and has the authority of the full board. Other items approved under the consent agenda that day included acceptance of the resignation of Andrea James as high school Spanish teacher, approval of continuing contracts for two other employees, approval of tutor contracts for two persons, and acceptance of the resignation of a high school guidance counselor.

{¶ 103} The school board meeting held on March 9, 2004 began at 7:00 p.m. After approval of minutes from the last meeting, at 7:27 p.m., the board moved into executive session for the purpose of discussing "personnel, legal matters and negotiations." Executive session ended at 12:34 a.m. Between 12:34 a.m. and

12:37 a.m., the board approved three resolutions containing 11 items under a consent agenda. The items included one salary adjustment, acceptance of the resignations of three employees, supplemental contracts for 13 employees, approval of summer school guidelines/curriculum, and approval of a rate increase for breakfast and lunch meals served at school buildings.

{¶ 104} Not surprisingly, the record reveals that there were complaints from the public that most board business was conducted in executive sessions. The record also reveals that the board received letters from the Madison County prosecutor and the editor-in-chief of the Madison Press newspaper regarding the proper use of executive sessions at public meetings.

{¶ 105} It should also be noted that during the time the above meetings were taking place, a number of significant issues were confronting the school district. During this time, Hinton was under investigation for allegations of inappropriate sexual conduct with female students, questions were being raised about the certification of Hinton and Andrea James, there was an issue about whether Hinton and Andrea James could continue to be paid by the school district, and there was national exposure concerning a Madison–Plains school bus driver who had assaulted a student on his bus. Further, the board was considering removal proceedings against Superintendent Shull. The minutes of board meetings during this period reflect none of these issues, which were certainly the subject of extensive public debate.

{¶ 106} In response, appellants contend that the reasons specified for going into executive session were sufficient because, for example, when the reason specified was "personnel," in each such instance, the word was used in conjunction with another word, such as "employment," "discipline," or "court negotiations." However, just because more than one of the permissible reasons for going into executive session were listed does not make the reasons more specific. The multiple reasons given for going to executive session in the minutes in fact make the designation less specific because the sessions normally consisted of more than one general topic.

{¶ 107} Appellants further contend that the record reveals no evidence that the board took any actions or voted on any decisions as a result of any allegedly unlawful executive sessions and that the remedies for alleged violations of the Open Meetings Act are an injunction to compel the members of the public body to comply and the payment of a $500 civil forfeiture. Appellants point out that the law provides that a member of a public body who knowingly violates an injunction "may be removed from office by an action brought in the court of common pleas for that purpose by the prosecuting attorney or the attorney general." R.C. 121.22(I). Given the specific remedies set forth for violations of the Open Meetings Act, appellants contend that any technical violations do not

constitute sufficient misfeasance, malfeasance, or nonfeasance to justify removal from office.

{¶ 108} However, the present case is not an action against appellants based solely upon knowing violation of the Open Meetings Act. It is an action against appellants for removal from office due to misfeasance, malfeasance, and nonfeasance, including, but not limited to, Open Meetings Act violations. The record reflects that the Madison–Plains School District Board of Education routinely violated the Open Meetings Act when going into executive session and also conducted meetings in a manner that discouraged public participation. The manner in which the meetings were conducted is a part of a larger pattern of misfeasance, malfeasance, and nonfeasance.

{¶ 109} Public officers may be removed for a series or pattern of misconduct. See *Gasper v. Washington Twp.*, Franklin App. No. 02AP–1192, 2003-Ohio-3750, 2003 WL 21652181. The evidence establishes that the Madison–Plains Board of Education, of which appellants comprised the majority of members, did violate the Open Meetings Act when it went into executive session and did conduct meetings so as to discourage public participation. The first assignment of error is overruled.

{¶ 110} The second assignment of error contends that the trial court erred by concluding that the individual appellants violated the Open Meetings Act or the Public Records Act based upon the contents of the minutes of certain meetings of the board of education. Appellants essentially argue that because there is no record of exactly what was discussed during the executive sessions at issue, the trial court improperly found that appellants violated the Open Meetings Act and/or the Public Records Act.

{¶ 111} A review of the trial transcript reveals that when appellants testified, they were not able to recall many specific details about what was discussed during the lengthy executive sessions held at board meetings. However, the minutes of these meetings do establish that the board entered into executive session on numerous occasions for long periods of time without giving any specific indication about what the members were going to discuss. Based upon the circumstances of this case, we find it reasonable to conclude, as did the trial court, that Ohio open-meetings laws were violated. Further, as previously indicated, the manner in which appellants conducted board of education meetings is only one portion of a much larger pattern of misfeasance, malfeasance, and nonfeasance by appellants. The second assignment of error is overruled.

{¶ 112} The third assignment of error contends that the trial court erred by concluding that the individual appellants violated the Open Meetings Act or the Public Records Act when the board of education delayed formally approving

its minutes in the spring and summer of 2004. The record indicates that on July 20, 2004, the board approved minutes of the following prior meetings: April 13, 2004; April 19, 2004; April 20, 2004 (regular meeting); April 20, 2004 (special meeting); April 27, 2004; May 11, 2004; May 18, 2004; June 19, 2004; June 25, 2004; and July 14, 2004. Angela Isaacs testified that these meetings were not approved in the regular course of business, i.e., at the next meeting, because there were "errors." She stated that she did not recall what the specific errors were.

{¶ 113} As far as this court is aware, there is no time requirement for the preparation of minutes of public meetings. However, minutes certainly should be prepared promptly and be made available to the public within a reasonable time. During her testimony, Angela Isaacs admitted that she knew that the actions of the school board were under intense scrutiny by the public during the period in question. The petition that resulted in the removal of appellants was filed on August 2, 2004.

{¶ 114} The timing of the issuance of minutes from these meetings was certainly inconvenient for those scrutinizing the school board's actions. There is no indication that meeting minutes had ever previously not been approved in a timely manner at the next scheduled meeting. The state of the record is such that the trial court could have found gross neglect of duty, misfeasance, malfeasance, or nonfeasance with respect to preparation of the minutes. The third assignment of error is overruled.

{¶ 115} In their fourth assignment of error, appellants contend that the trial court erred by concluding that the school district's continued employment and payment of teachers who did not complete the course work necessary to obtain their teaching certification by December 31, 2003 was a violation of law. Appellants argue that the employment and assignment of teachers is the obligation of the superintendent and not the direct responsibility of the board of education. See R.C. 3319.36.

{¶ 116} However, the trial court found, and the record supports, that in this case the board of education, and appellants in particular, had taken over the superintendent's responsibilities and were not allowing him to function as superintendent. When Superintendent Shull expressed concerns about the certification of Andrea James and Hinton to teach the subjects they were hired to teach, he was told to leave these teachers alone.

{¶ 117} The board of education, of which appellants comprised a majority, found Shull's performance "unsatisfactory" in every area during his November 15, 2003 evaluation. The evaluation, signed by appellant Blenda James as board president, set forth many examples in which Shull demonstrated "flawed judg-

ment or incompetence, inappropriate behaviors, unethical actions, misinformation, miscommunication." It stated that Shull had "failed to comply with the board's wishes, and [demonstrated] a form of leadership that a majority of the Board cannot condone. It is apparent that [he has] not been willing to cooperate with [the board's] suggestions for improvement to be successful in the Madison–Plains School District. * * * In no way [is he] to impede or undermine by deed, word or implication that the Board is not right. * * * [He is] to allow administrators the responsibility of running their open buildings or areas without interference. To help or offer suggestions only when asked. To allow the chain of command to work. Other arrangements are to be made for evaluating teachers under teacher leaders."

{¶ 118} It is clear from the record that Superintendent Shull was not making any decisions of import on behalf of the Madison–Plains School District. The school board, dominated by appellants, was making these decisions. Appellants knew that Andrea James and Hinton were not properly certified to teach the subjects that they were teaching, that there was an issue as to whether they should be paid, and that Hinton might have been engaging in inappropriate activities with female students. However, far from asking Shull to address these issues, appellants were directing him to "cooperate with [their] suggestions" and "help or offer suggestions only when asked."

{¶ 119} As school board members, appellants' first duties run to the students. The Madison–Plains board member code of ethics begins as follows:

{¶ 120} "While serving as a member of the Board of Education, I accept the responsibility to improve public education. To that end I will: remember that my first and greatest concern must be the educational welfare of all students attending the public schools."

{¶ 121} R.C. 3319.36(A) provides that "[n]o treasurer of a board of education or educational service center shall draw a check for the payment of a teacher for services until the teacher files with the treasurer * * * the following:

{¶ 122} "(1) Such reports as are required by the state board of education, the school district board of education, or the superintendent of schools;

{¶ 123} "(2) * * * a written statement * * * that the teacher has filed with the treasurer a legal educator license or a true copy of it, to *teach the subjects or grades taught,* with the dates of its validity." (Emphasis added.)

{¶ 124} We disagree with appellants' contention that they were relying upon Superintendent Shull when they allowed Andrea James and Hinton until December 31, 2003 to finish the course work necessary to obtain certification. The record reveals that appellants did not believe any representations made by Shull with regard to teacher certification and were determined to continue to employ

and pay these two teachers, even though this was probably illegal and certainly not in the best interest of the school district or its students. The fourth assignment of error is overruled.

{¶ 125} In their fifth assignment of error, appellants contend that the trial court erred by concluding that the board of education's February 18, 2004 resolution (stating that when the board of education is not in session, the board president represents the board and has the authority of the full board) was a violation of law by the individual appellants. As noted above, on February 18, 2004, appellants passed as part of a consent agenda, without any public discussion or debate, a resolution granting Robert Kuehnle, as president, the authority of the full board when the board is not in session.

{¶ 126} Although appellants argue otherwise, this resolution was clearly a violation of board policy and the law of the state of Ohio. The Madison–Plains School District Board of Education code of ethics states that each board member should "recognize that as an individual board member [he has] no authority to speak or act for the board." Further, a school board is a public body pursuant to Ohio law. See R.C. 121.22(A). Public officials are permitted to take official action only in open meetings. By granting the president the full authority of the board when the board is not in session, appellants in effect made regular board meetings unnecessary and permitted the board to take action without the vote of all board members or any input from the public.

{¶ 127} The February 18, 2004 resolution turned a public board of education into a dictatorship not accountable to anyone. Appellants admittedly passed this resolution so that they could control Superintendent Shull without having to be accountable to anyone. They found it necessary to control Shull because he was, inter alia, raising issues about the certification and payment of Andrea James and Hinton.

{¶ 128} The voters elected a five-member school board, which they entrusted with authority to further the best interest of the students in the school district. Appellants breached that trust by, without limitation, vesting their authority in one individual and placing the employment of friends and relatives above that of the school district, the students, and the taxpayers. The fifth assignment of error is overruled.

{¶ 129} In their sixth assignment of error, appellants contend that the trial court erred by concluding that appellant Kuehnle's actions after the board of education's February 18, 2004 resolution (stating that when the board of education is not in session, the board president represents the board and has the authority of the full board) violated Ohio law. Appellants appear to be arguing

that the actions that appellant Kuehnle took as a result of the February 18, 2004 resolution did not violate Ohio law.

{¶ 130} It is clear from the record that the February 18, 2004 resolution was more of a reaction to Shull's past unwillingness to follow directions given to him by individual board members. For example, on January 15, 2004, Kuehnle sent Shull a letter that read in its entirety as follows:

{¶ 131} "Dear Dan:

{¶ 132} "Effective immediately, I am requesting that I receive a duplicate copy of any memo sent to an employee.

{¶ 133} "I also want an explanation for your visits to the High School dealing with Mr. Kenny Hinton in the last two weeks.

{¶ 134} "I also want an explanation of why the high school principal's position was 1) posted two months before the board wanted it posted and 2) Why was it posted in last week's paychecks?

{¶ 135} "Also remember that you are to include your weekly schedule in the board president's packet.

{¶ 136} "If you have any questions, you may contact me by e-mail. My address is * * *."

{¶ 137} Shull responded to the above memorandum with a letter to the board dated January 20, 2004, which stated that all powers of the board of education lie in its actions as a group and that an individual board member acts on behalf of the board only when the board has delegated authority to the individual member. Also, as mentioned above, Shull caused a letter to the same effect to be written to Robert Kuehnle by Attorney Kimball H. Carey.

{¶ 138} Accordingly, the February 18, 2004 resolution was more of a reaction by the school board than a directive designed to cause the president of the board to take any specific action. Whether or not the record contains specific instances subsequent to the resolution where Robert Kuehnle acted with the authority of the full board when the board was not in session was not particularly important to the issue of whether appellants, in their capacities as school board members, acted in gross neglect of duty, misfeasance, malfeasance, or nonfeasance.

{¶ 139} Appellants cite *Rumora v. Ashtabula Bd. of Edn.* (C.P.1973), 43 Ohio Misc. 48, 72 O.O.2d 369, 335 N.E.2d 378, to support their contention that Shull's position that he was required to obey only directives from the full board "is contrary to Ohio law and a blatant act of insubordination." However, a reading of *Rumora* does not support this position. Although *Rumora* acknowledges that a superintendent who wishes to have a "harmonious relationship" with a board of education will carry out policies that he knows to be desired by the majority of

the board without formal action by the board, the court admitted that what is required with respect to informal action "is that it be the expression of the board rather than merely the expression of a member of the board. To constitute the expression of the board, it must clearly be the expression of the majority of the board." Id. at 68, 72 O.O.2d 369, 335 N.E.2d 378.

{¶ 140} Appellants also contend that a policy of the Madison–Plains Local School District Board of Education expressly contemplates a resolution like the one passed on February 18, 2004. According to the policy, "an individual Board member acts on behalf of the Board, only when, by vote, the Board has delegated authority to him/her." However, it is apparent that this policy refers to specific actions expressly delegated by the board to individual board members and does not endorse a complete abdication of power to the board president when the board is not in session.

{¶ 141} The February 18, 2004 resolution was a means for appellants, as a majority of the members of the Madison–Plains School District Board of Education, to validate the orders Robert Kuehnle had previously given to Superintendent Shull in the past and legitimize any orders Kuehnle might give Shull in the future. The motion improperly gave the full power of the board to the president when the board was not in session. We agree with the trial judge that this action by appellants as members of the board amounts to gross neglect of duty, misfeasance, malfeasance, and/or nonfeasance. Whether appellant Kuehnle had the opportunity to exercise the power granted to him as president of the school board does not affect the trial court's decision and does not give this court any basis to overrule it. The sixth assignment of error is overruled.

{¶ 142} In their seventh assignment of error, appellants contend that the trial court erred by concluding that appellant Blenda James's vote to approve two supplemental coaching contracts for her husband, James James, and vote to employ her daughter, Andrea James, amounted to misconduct. Appellants contend that this conduct was not specifically included in the allegations contained in the complaint and that to the extent these actions violate Ohio ethics laws, the Ohio Ethics Commission or a county prosecutor would have the proper jurisdiction to prosecute such violations.

{¶ 143} Paragraph 67 of the complaint states that appellant Blenda James "has voted to approve matters in which she and her immediate family have a financial interest and has failed to act as mandated by her position to protect the district from detrimental situations caused by circumstances in which she and her immediate family have a financial interest." Civ.R. 8(A) provides that a pleading that sets forth a claim for relief shall contain a short and plain statement of the claim showing that the party is entitled to relief and a demand for

judgment for the relief for which the party claims to be entitled. A pleading that sets forth a claim for relief need not state with precision all elements that give rise to a legal basis for recovery as long as a fair notice of the action is provided. *Fancher v. Fancher* (1982), 8 Ohio App.3d 79, 8 OBR 111, 455 N.E.2d 1344.

{¶ 144} In this case, there is little question that appellant Blenda James knew that the complaint was alleging that she had, as a member of the Madison–Plains School District Board of Education, improperly voted to approve matters in which her immediate family had a financial interest. There is no question that Blenda James was aware that her husband was the principal of Madison–Plains High School and that her daughter taught Spanish there. Moreover, in her testimony, Blenda James acknowledged that she believed that it was not ethical to vote for her husband or a family member and stated that she did not knowingly or intentionally do so. However, she could not deny that the minutes of several school board meetings indicated that she had. We find that the complaint was sufficient to put appellant Blenda James on notice with respect to the nature of this allegation.

{¶ 145} With regard to the issue of whether separate allegations of ethical wrongdoing should have been brought against appellant Blenda James by the Ohio Ethics Commission or a county prosecutor, such does not preclude this court's jurisdiction. It is clear from the record that appellant Blenda James, as a member of the Madison–Plains School Board, did improperly vote to the advantage of family members, i.e., her husband and her daughter, at school board meetings. Minutes of the board meetings, which were approved by appellant Blenda James and the other board members, indicate that she did in fact vote for family members as alleged. The trial court's conclusion that such conduct constituted gross neglect of duty, misfeasance, malfeasance, and/or nonfeasance is supported by the record. The seventh assignment of error is overruled.

{¶ 146} In their eighth assignment of error, appellants contend that the trial court erred by concluding that appellant Angela Isaacs's telephone call to Madison County Children Services Investigator Kathy Wolboldt amounted to attempted obstruction of an official investigation. This court disagrees.

{¶ 147} Appellants first argue that the complaint never put appellant Angela Isaacs on notice that her telephone conversation with Wolboldt was going to be considered as alleged obstruction of an official investigation. We disagree. Paragraph 61 of the complaint states that "[t]he board members even had the audacity to illegally hinder and jeopardize the investigation of county authorities into Hinton's illegal conduct until Hinton finally directly admitted to a portion of the acts to school officials and to the Madison Press in an interview." Again, Civ.R. 8(A) requires only that a pleading contain a short and plain statement of

the circumstances entailing the party to relief. A party is not required to plead the legal theory of recovery or the consequences that naturally flow by operation of law from the legal relationship of the parties. *Illinois Controls, Inc. v. Langham* (1994), 70 Ohio St.3d 512, 639 N.E.2d 771.

{¶ 148} The complaint provided adequate notice to the appellants that they were accused of protecting Hinton and attempting to continue his employment with Madison–Plains School District despite allegations of misconduct. In addition to paragraph 61 quoted above, paragraph 57 of the complaint states that board members "sought at every turn to cover up and hinder investigations into the widely known misconduct and abuse of minor female students by Kenny Hinton."

{¶ 149} Appellants also argue that appellant Angela Isaacs did not intend to obstruct Wolboldt's investigation by making the telephone calls and that the telephone calls in fact did not obstruct Wolboldt's investigation. Appellants argue that Isaacs's conduct simply does not constitute obstruction of official business or attempted obstruction of official business under R.C. 2921.31.

{¶ 150} Wolboldt testified that Isaacs telephoned her at approximately 12:10 p.m. on March 12 and identified herself as a member of the Madison–Plains School District Board of Education. Wolboldt stated that Isaacs told her that "they were having problems with Dr. Shull, their superintendent; concerns that Dr. Shull was exaggerating stories and she wanted to know who the referral source was * * *." Wolboldt stated that Isaacs specifically asked her if Dr. Shull referred the Hinton matter to children services, and Wolboldt told Isaacs that she could not discuss that with her. Wolboldt testified that based upon the conversation, she concluded that Isaacs was telling her that if "Shull was the referral source, that the allegations might not be the entire picture, the entire truth."

{¶ 151} Wolboldt testified that Isaacs called her back again the same day to tell her that Hinton would not be on school property during the investigation and to again express concern that the allegations were exaggerated. Wolboldt stated that she was concerned that Isaacs "seemed to be more concerned on who the referral source was rather than the victim at that point."

{¶ 152} During her testimony, Isaacs admitted that one of the reasons that she called Wolboldt was to tell her that Shull might not be telling the truth: "Saying exaggerated stories was a nice way of saying Dr. Shull lies. * * * Basically I didn't believe a lot of what he was telling us." When asked on cross-examination, whether her primary concern when making the phone call to Wolboldt was concern for the victims, Isaacs candidly responded as follows: "No, especially after listening to Ms. Wolboldt's testimony yesterday, I was very focused on what

I believed to be Dr. Shull lying. Again, back then we didn't know what we know now."

{¶ 153} Based upon the record, there is sufficient evidence to support the trial court's determination by clear and convincing evidence that appellant Angela Isaacs was guilty of, inter alia, malfeasance by attempting to obstruct the official business of the department of children services in its investigation of Hinton. We again observe that the scope of this appeal is not limited to the narrow issue of whether Isaacs attempted to obstruct official business, but whether three Madison–Plains school board members engaged in gross neglect of duty, misfeasance, malfeasance, and/or nonfeasance such that they should be removed from office. The eighth assignment of error is overruled.

{¶ 154} In their ninth assignment of error, appellants contend that the trial court erred by relying on a tape recording of a telephone call Isaacs made to the county sheriff on a topic unrelated to children services' investigation of Kenny Hinton when the tape was not admitted as evidence at trial but only proffered. Appellants contend that the trial court relied on this tape as proof of Isaacs's intent to obstruct children services' investigation.

{¶ 155} From the record, it appears that the purpose of the tape was to show that Angela Isaacs had telephoned the Madison County Sheriff's Office on another occasion about an unrelated topic "seeking information." Appellees' counsel attempted to play the tape at trial to question Isaacs's stated purpose: "She said simply to seek information. From the tone of the tape I would not believe it was for that purpose." The tape was not admitted into evidence by the trial court.

{¶ 156} Appellants assert that the trial court relied on testimony about this tape recording to support the conclusion that Isaacs's conversation with Wolboldt was an intentional effort to block the children services agency's investigation. However, it appears from the record that the trial court relied upon the testimony of Isaacs and Wolboldt specifically with respect to the Hinton situation to reach the conclusion that Isaacs had attempted to obstruct official business.

{¶ 157} Contrary to appellants' contention, it does not appear from the record that the trial court relied on the tape or any discussion surrounding it to support its conclusion that Isaacs's conversation with Wolboldt was an intentional effort to interfere with an investigation. The ninth assignment of error is overruled.

{¶ 158} In their tenth assignment of error, appellants argue that the trial court erred by permitting the trial to proceed against all four respondents together. The complaint in this matter sought removal of four individual members of the Madison–Plains Local School District Board of Education. The

complaint contained multiple, but not fully overlapping, allegations against each of the appellants.

{¶ 159} Appellants state that a close reading of R.C. 3.07 and 3.08 shows that the statutory procedure for removing a public officer is limited to a single petition or complaint and a single court hearing involving a single public officer. Appellants state that this is "apparent" from the fact that the singular tense is used throughout both statutes. For example, R.C. 3.07 contains the phrase "any person holding office."

{¶ 160} Absent demonstrated prejudice, this court finds no reason to construe the removal statutes as applicable only to a single public officer. R.C. 1.43, which concerns rules of construction applicable to the Ohio Revised Code, states that "the singular includes the plural, and the plural includes the singular." Furthermore, as pointed out by appellees, there is precedent in Ohio for multiple respondents to be named in a single complaint in removal cases. In *State ex rel. Ragozine v. Shaker*, 96 Ohio St.3d 201, 772 N.E.2d 1192, 2002-Ohio-3992, five school board members were respondents in proceedings for removal under R.C. 3.07. Three school board members were sought to be removed in *In re Augenstein* (1977), 53 Ohio App.2d 327, 7 O.O.3d 424, 374 N.E.2d 160, and *In the Removal of Stringer v. Stringer* (Mar. 21, 1986), Trumbull App. No. 3664, 1986 WL 3532.

{¶ 161} Whether to try appellants together or separately was a matter within the discretion of the trial judge. It is typical in criminal cases for multiple defendants to be charged under a single indictment and tried together absent a showing of prejudice. Here, the record reveals no prejudice to appellants. The record shows that when making the decision to try appellants together, the trial judge considered the alternatives and decided to proceed with a single trial. We find no abuse of discretion. The tenth assignment of error is overruled.

{¶ 162} In their eleventh assignment of error, appellants contend that the trial court erred by permitting the complainants (appellees) to subpoena appellants and question them on cross-examination as part of the complainants' case-in-chief. Appellants argue that removal proceedings are quasi-penal in nature and that the governing statutes should be strictly construed. Appellants observe that in a criminal proceeding, a defendant would receive a specific indictment or bill of information, a complete listing of witnesses from the state, and advance notice of all documentation and potential exculpatory evidence. Appellants argue that they did not receive any of this information, yet were required to testify at the very beginning of the case.

{¶ 163} The removal of a public officer is a judicial proceeding, and the respondent is entitled to due process of law. *In re Tunstall* (C.P.1939), 28

Ohio Law Abs. 635, 14 O.O. 309. There does not appear to be any requirement that proceedings in a removal action be equivalent to those in a criminal trial. The manner in which a trial is conducted is within the discretion of the trial court. An abuse of discretion means more than an error of judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 404 N.E.2d 144. When applying the abuse-of-discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Freeman v. Crown City Mining, Inc.* (1993), 90 Ohio App.3d 546, 630 N.E.2d 19.

{¶ 164} Upon review of the record, the court finds that the manner in which the proceedings below were conducted by the trial court complied with due process and were otherwise within the discretion of the trial court. We note that appellants failed to make any objection to the trial procedure that was followed. Failure to object to the admission of evidence generally waives the right to assign error on appeal. *Blanton v. Internatl. Minerals & Chem. Corp.* (1997), 125 Ohio App.3d 22, 707 N.E.2d 960. The eleventh assignment of error is overruled.

{¶ 165} In their twelfth assignment of error, appellants contend that the trial court erred by questioning the Madison County Sheriff and a lieutenant in the sheriff's office about matters pertaining to the evidence presented. Briefly, during testimony presented to the court, there was a discrepancy between Warner's notes and James James's report to the board with respect to allegations against Hinton. James's report to Shull indicated that there was no reason to pursue the matter further and that he had no concerns about inappropriate behavior by Hinton. Warner's notes indicated that Hinton sent inappropriate e-mails to a female student and that the student's father, who is a policeman, was holding the e-mails as evidence.

{¶ 166} After James's report and Hinton's notes were admitted as evidence, the trial court apparently talked with the Madison County Sheriff and the sheriff's office lieutenant involved in the Hinton investigation. Prior to the afternoon session on the next day of trial, the trial court made the following statement on the record:

{¶ 167} "Counsel, before we get started, last Friday when the exhibits were offered I indicated at that time that I wanted the sheriff to attempt to reconcile the difference between Sally Warner's notes * * * and Jim James' [sic] report to the board * * *. I gave Sheriff Saltsman those two documents. Lieutenant Crabbe came back yesterday and indicated strongly that they might not be reconcilable. That was said yesterday afternoon. I indicated to counsel that this morning and made Crabbe available to counsel at quarter of twelve and I believe counsel had an opportunity to talk to him.

{¶ 168} "The one clear thing is that Crabbe cannot testify to affect the credibility of James because that would be hearsay evidence and I would leave it at that. At this point if the record needs to be perfected beyond that it can be at the close of today."

{¶ 169} Sheriff Saltsman was included on the complainants' (appellees') witness list but was not called as a witness. Lieutenant Crabbe had already testified at the trial and had been excused. Appellants made no objection at trial to the trial judge's statement quoted above.

{¶ 170} It was error for the trial court to, in effect, conduct an independent investigation to attempt to reconcile two conflicting exhibits presented at trial. However, the record indicates that prior to doing so, the trial judge informed the parties that he would ask the sheriff to reconcile the exhibits, and neither party objected. Further, both parties were apparently given the opportunity to question Lieutenant Crabbe about his inability to reconcile the two exhibits, and they presumably would have had the opportunity to recall Lieutenant Crabbe to the witness stand for further testimony if either party had found it to be beneficial. Given that there was no objection made to any of this procedure, we find that any error has been waived and cannot now be asserted on appeal.

{¶ 171} Moreover, whether or not these two exhibits can be reconciled has virtually no effect on whether appellants are guilty of gross neglect of duty, misfeasance, malfeasance, or nonfeasance in the performance of their duties as members of the Madison–Plains School Board. Civ.R. 61, Crim.R. 52, and R.C. 2309.59 all require a reviewing court to disregard errors that do not prejudice or affect the substantial rights of a party. We find any procedural error committed by the trial court to be harmless. The twelfth assignment of error is overruled.

{¶ 172} Appellants contend in their thirteenth assignment of error that the trial court erred by relying on hearsay statements contained in an after-the-fact memorandum written by Alexander to the Madison County Sheriff's Office about Hinton's alleged misconduct. Alexander did not testify at trial. Appellants contend that the trial court relied on Alexander's memorandum as proof of appellants' intent and bad faith in their actions with respect to Hinton.

{¶ 173} The trial judge admitted Alexander's memorandum and Warner's notes into evidence under the business-records exception to the hearsay rule. Evid.R. 803(6) provides that the following are not excluded by the hearsay rule, even if the declarant is available as a witness:

{¶ 174} "Records of regularly conducted activity. A memorandum, report, record or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if

kept in the course of a regularly conducted business activity, and if it was made in the regular practice of that business activity to make the memorandum, report, record, or data compilation * * *."

{¶ 175} Warner and Alexander were employees of the Madison–Plains School District. Warner held the position of school counselor, and Alexander held the position of director of special education. Clearly, the memoranda that they authored and any reports that they made regarding Hinton's activities with students were documents kept in the course of a regularly conducted business activity, and to the extent such documents constitute hearsay, they fall within the business-records hearsay exception set forth in Evid.R. 803(6). The thirteenth assignment of error is overruled.

{¶ 176} In their fourteenth assignment of error, appellants contend that the trial court erred by finding misconduct in areas where they relied upon the advice of legal counsel for the board of education. Specifically, appellants state that the board relied on the advice of legal counsel with respect to certification and pay issues concerning Andrea James and Kenny Hinton and with respect to the February 18, 2004 resolution stating that when the board of education is not in session, the board president represents the board and has the authority of the full board.

{¶ 177} During trial, board member Michael Brandt testified that he consulted with legal counsel with respect to pay issues concerning Andrea James and Kenny Hinton. Robert Kuehnle testified that he consulted with the board's legal counsel with respect to the February 18, 2004 resolution. However, the record contains no written documentation with respect to advice received from legal counsel, nor did the board's legal counsel testify with respect to the legal advice sought and received. This court notes, as did the trial court, that John Podgursky, legal counsel to the board of education, withdrew his services on the second day of trial in anticipation of being called as a witness but was never called.

{¶ 178} Further, the record is devoid of evidence that any legal advice sought by appellants was sought in good faith or that reliance on the advice received was reasonable. The evidence did establish that appellants were determined to continue to employ Andrea James and Hinton if at all possible, even if such employment was contrary to the best interests of Madison–Plains School District and the students thereof. The fourteenth assignment of error is overruled.

## CONCLUSION

{¶ 179} After being elected to the Madison–Plains Local School District Board of Education, appellants each took an oath to perform faithfully the duties of his

or her office. The primary responsibility of the board was to establish purposes, programs, and procedures that produce the educational achievement needed by district students. According to the board's code of ethics, appellants' first and greatest concern was to be the educational welfare of all students. They were to obey the laws of Ohio and the United States. They were to recognize that, as individual board members, they had no authority to speak or act for the board. They were to avoid conflicts of interest or the appearance thereof. They were to refrain from using their position for the benefit of themselves, family members, or business associates and to support the employment of staff members based upon qualifications and not as a result of improper influence.

{¶ 180} Appellants had a fiduciary duty as board members to act in the best interests of the students of the Madison–Plains School District, their parents, the taxpayers of the school district, and the taxpayers of the state of Ohio. Appellants breached that duty. They violated R.C. 3.07 by engaging in gross neglect of duty, misfeasance, malfeasance, and nonfeasance. They placed their own interests and the interests of others above those of the students and the school district. Appellants committed numerous violations of the law and of judgment that individually and collectively warrant the severe sanction of removal. Viewing the record as a whole, the trial court's decision to remove appellants is supported by clear and convincing evidence.

Judgment affirmed.

YOUNG, P.J., and VALEN, J., concur.

ANTHONY VALEN, J., retired, of the Twelfth Appellate District, sitting by assignment.